John DOE, by his next friend and father, Richard Doe, Individually and on behalf of all others similarly situated

v.

Aldo COLAUTTI, Individually and in his official capacity as Secretary of Public Welfare, Pennsylvania Department of Public Welfare and Glenn Johnson, Individually and in his official capacity as Director of Medical Assistance, Pennsylvania Department of Public Welfare.

Civ. A. No. 78–1413.

United States District Court, E. D. Pennsylvania.

June 21, 1978.

R. Michael Owens, Elliot B. Platt, Philadelphia, Pa., for plaintiffs.

Margaret E. Anderson, Asst. Atty. Gen., Philadelphia, Pa., for defendants.

## OPINION

LUONGO, District Judge.

This civil action presents a challenge to section 443.1 of the Pennsylvania Public Welfare Code, as amended, Pa.Stat.Ann. tit. 62, § 443.1 (Purdon Supp.1978), which imposes certain limits on medical assistance benefits payable for inpatient care in a private psychiatric hospital. John Doe, the pseudonymous plaintiff, is presently an inpatient at the Institute of Pennsylvania Hospital, a private psychiatric hospital located in Philadelphia. Under the challenged statutory provision, plaintiff has exhausted his currently available benefits, and he seeks a judicial determination that he is entitled to further benefits in order that he may remain an inpatient. On May 31, 1978, I entered a temporary restraining order directing defendants, who are officials of the Pennsylvania Department of Public Welfare, to continue paying benefits to the Institute of Pennsylvania Hospital on behalf of plaintiff. On June 7 and 12, I heard testimony and argument bearing on plaintiff's motion for a preliminary injunc-

tion, and I extended the restraining order pending my decision on that motion. For the reasons hereafter stated, I now conclude that the motion for a preliminary injunction must be denied.

Title XIX of the Social Security Act, 42 U.S.C.A. §§ 1396–1396k (1974 & Supp.1978), "establishes the Medicaid program under which participating States may provide federally funded medical assistance to needy persons." *Beal v. Doe,* 432 U.S. 438, 440, 97 S.Ct. 2366, 2368, 53 L.Ed.2d 464 (1977) (footnote omitted). The Commonwealth of Pennsylvania participates in the Medicaid program, and it has implemented a federally-approved "plan for medical assistance." 42 U.S.C.A. § 1396a (1974 & Supp.1978). Although participating states *must* provide medical assistance benefits for certain specific services, 42 U.S.C.A. § 1396a(a)(13) (1974 & Supp.1978), Title XIX generally "confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Beal v. Doe,* 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977) (footnote omitted) (quoting 42 U.S.C. § 1396a(a)(17) (Supp. V 1975)).

At issue here is section 443.1 of the Pennsylvania Public Welfare Code, as amended, which defines the extent of medical assistance available under the Pennsylvania plan for various types of institutional care. This section differentiates sharply between general inpatient hospital care, on the one hand, and inpatient care in a private psychiatric hospital, on the other. With respect to the former, section 443.1(1) authorizes medical assistance payments for "[t]he reasonable cost of inpatient hospital care." Pa.Stat.Ann. tit. 62, § 443.1(1) (Purdon Supp.1978). With respect to the latter, however, section 443.1(4) provides that benefits for "[c]are in a private mental hospital shall be limited to sixty days in a benefit period." *Id.* § 443.1(4). *See also* note 3 *infra.* When read in conjunction with the statutory definition of "benefit period," this limitation requires an individual who has received medical assistance benefits for six-

ty days of inpatient care in a private psychiatric hospital to undergo a sixty-day period "during each day of which he is not an inpatient in a hospital" in order to become eligible for an additional sixty days' benefits. *Id.* § 402. Each time an individual receives such additional benefits, he must again become an outpatient for sixty days as a prerequisite to receipt of further benefits for inpatient care in a private psychiatric hospital.

Plaintiff is an incompetent adult presently residing at the Institute of Pennsylvania Hospital. Although he desires to remain there as an inpatient, the Pennsylvania Department of Public Welfare, which pays out benefits under the Pennsylvania medical assistance plan, "will make no further payments for plaintiff's private in-patient psychiatric care because [he] has exhausted his benefit period." Stipulation ¶ 10.

Plaintiff, using the fictitious name of John Doe, "brings this action by his next friend and father" under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1970). Complaint ¶ 2. He urges that Pennsylvania's sixty-day limitation on benefits for inpatient psychiatric care violates both the equal protection clause and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. V 1975), and he seeks both declaratory and injunctive relief. Jurisdiction over this action is conferred by sections 1331, 1343(3), and 1343(4) of title 28, United States Code.

In deciding whether to grant preliminary injunctive relief, a district court generally focuses on two issues: (1) Has the moving party shown that he will be irreparably harmed before the case can be finally determined unless relief *pendente lite* is granted? (2) Has the moving party shown a reasonable probability that he will prevail on the merits when the case is finally determined? In addition to these considerations, however, the court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Delaware*

River Port Auth. v. Transamerican Trailer Transport, Inc., 501 F.2d 917, 920 (3d Cir. 1974); see, e. g., A. O. Smith Corp. v. Federal Trade Comm'n, 530 F.2d 515, 525 (3d Cir. 1976); Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958) (per curiam), followed in Parker v. Penn Central Transp. Co. (In re Penn Central Transp. Co.), 457 F.2d 381, 384–85 (3d Cir. 1972). Underlying these formulations, of course, is the concern "to minimize the probable irreparable loss of rights caused by errors incident to hasty decision." Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv.L.Rev. 525, 541 (1978). After careful consideration of the testimony and arguments presented in this case, I conclude that plaintiff's likelihood of ultimate success on the merits is so slight as to preclude the issuance of preliminary injunctive relief.

With respect to the "irreparable injury" requirement, the Third Circuit has noted:

"[A]n essential prerequisite to the grant of a preliminary injunction is a showing by the movant of irreparable injury pendente lite if the relief is not granted. The key aspect of this prerequisite is proof that the feared injury is irreparable; mere injury, even if serious or substantial, is not sufficient."

United States v. Pennsylvania, 533 F.2d 107, 110 (3d Cir. 1976) (citations omitted). Based on the evidence submitted at the hearing, I find that plaintiff very possibly will suffer irreparable harm unless defendants are preliminarily enjoined to continue paying medical assistance benefits on his behalf.

In attempting to meet the "irreparable injury" requirement, plaintiff relied largely on the expert testimony of Dr. Nathan L. Comer, his treating psychiatrist at the Institute of Pennsylvania Hospital. Dr. Comer testified at his deposition that plaintiff was referred to the Institute in early April of 1978, following an unsuccessful attempt at suicide. N.T. 4. Since that time, Dr. Comer has seen plaintiff approximately three times a week for individual psycho-therapy at the Institute. N.T. 5–6. Dr. Comer also testified that plaintiff presently suffers from a "schizoaffective reaction," and that plaintiff's prognosis is "guarded." N.T. 5, 10–11. Moreover, he stated that plaintiff's condition has deteriorated "in the past month or so,"[1] and that plaintiff refuses to eat or drink anything. N.T. 6.

It appears that plaintiff's family cannot afford to pay for continued inpatient care at the Institute, and that, if no further medical assistance benefits are available, plaintiff's family will have no alternative but to arrange for plaintiff to become an inpatient at Philadelphia State Hospital, which is the designated state-run facility for persons who reside in Philadelphia, as plaintiff does, and require long-term care. See generally Pa.Stat.Ann. tit. 50, §§ 7101–7503 (Purdon Supp.1978) (Mental Health Procedures Act). Accordingly, counsel on both sides questioned Dr. Comer closely about the likely effects of such a transfer on plaintiff's condition. In this regard, Dr. Comer testified that "there is a very definite possibility" that plaintiff might again attempt to commit suicide, N.T. 9, and that, in any event, a transfer would significantly retard plaintiff's progress by disrupting his present patient-therapist relationship and requiring him to establish a rapport with a new psychiatrist or psychotherapist. N.T. 9–10, 13–14. Moreover, Dr. Comer testified that most persons with schizophrenic disorders who eventually respond to treatment do so within two or three months, and that the prognosis for a schizophrenic individual who does not respond within that time "goes rapidly downhill until after a year the prognosis is very gloomy." N.T. 14. Thus, the setback and loss of time caused by a transfer might worsen plaintiff's overall chances for improvement. N.T. 28. Dr. Comer conceded, however, that he knows of no method that can accurately predict the probability that such a transfer would impinge upon plaintiff's overall prognosis. Id.

Notwithstanding the difficulty of making valid and reliable psychiatric predictions, I

---

1. Dr. Comer's deposition was taken on June 9, 1978.

am satisfied that plaintiff has shown a significant potential for irreparable harm if defendants are not preliminarily enjoined.

The "likelihood of success" requirement, however, presents an insurmountable obstacle to plaintiff's case. Granting that the requirement is somewhat amorphous,[2] and looking for nothing more than "a reasonable probability of eventual success in the litigation," I nevertheless conclude that plaintiff is not entitled to preliminary injunctive relief. *Delaware River Port Auth. v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974). This conclusion obtains both with respect to plaintiff's statutory argument and with respect to his constitutional argument.

## SECTION 504 OF THE REHABILITATION ACT

■ Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Supp. V 1975), provides:

> "No otherwise qualified handicapped individual in the United States, as defined in [29 U.S.C. § 706(6)], shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

It is now well-settled that a handicapped individual has an implied private right of action under this provision. *See, e. g., Leary v. Crapsey,* 566 F.2d 863, 865 (2d Cir. 1977) (per curiam); *United Handicapped Fed'n v. Andre,* 558 F.2d 413, 415 (8th Cir. 1977); *Lloyd v. Regional Transp. Auth.,* 548 F.2d 1277, 1284–87 (7th Cir. 1977); *Davis v. Bucher,* 451 F.Supp. 791, 797–798 (E.D.Pa. 1978); *Halderman v. Pennhurst State School & Hosp.,* 446 F.Supp. 1295, 1323–24 (E.D.Pa.1977).

■ Defendants do not dispute that plaintiff is a "handicapped individual" within the meaning of section 504. Section 7(6) of the Act defines a "handicapped individu-

al," for purposes of section 504, as "any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment." 29 U.S.C. § 706(6) (Supp. V 1975). Moreover, the interpretative regulations issued by the Secretary of Health, Education, and Welfare define "physical or mental impairment" to include, *inter alia,* "any mental or psychological disorder." 45 C.F.R. § 84.3(j)(2)(i)(B) (1977). Thus, plaintiff unquestionably is a "handicapped individual" within the meaning of section 504.

■ Furthermore, the parties have stipulated that the Commonwealth of Pennsylvania and, more specifically, the Pennsylvania Department of Public Welfare, receive federal financial assistance "for a variety of programs and purposes including but not limited to mental health programs." Stipulation ¶ 11. By reason of this federal assistance, of course, the Pennsylvania medical assistance program is subject to the antidiscrimination mandate of section 504.

■ The central question, then, is this: Does Pennsylvania's sixty-day limitation on benefits for inpatient care in a psychiatric hospital discriminate against plaintiff "solely by reason of his handicap?" Plaintiff strenuously urges that it does, and in support of this contention he relies primarily on the interpretative regulations adopted by the Secretary of Health, Education, and Welfare. Subpart F of these regulations elucidate the constraints imposed by section 504 upon a provider of health services. In pertinent part, the regulations provide:

> "(a) *General.* In providing health, welfare, or other social services or benefits, a recipient [of federal financial assistance] may not, on the basis of handicap:
>
> (1) Deny a qualified handicapped person these benefits or services;

---

**2.** A recent commentary points out that "[o]ne line of cases requires plaintiffs to show a fair question of success on the merits, another a substantial probability of success, another a reasonable certainty, and another a clear right." Leubsdorf, *The Standard for Preliminary Injunctions,* 91 Harv.L.Rev. 525, 526 (1978) (footnotes omitted).

(2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons;

(3) Provide a qualified handicapped person with benefits or services that are not as effective . . . as the benefits or services provided to others;

(4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons; or

(5) Provide different or separate benefits or services to handicapped persons except where necessary to provide qualified handicapped persons with benefits and services that are as effective as those provided to others."

45 C.F.R. § 84.52(a) (1977).

Plaintiff also relies on the more general provisions of subpart A of the regulations:

"(a) *General.* No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance.

(b) *Discriminatory actions prohibited.* (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons

with aid, benefits, or services that are as effective as those provided to others;

. . . . .

(vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

(2) For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

(3) Despite the existence of separate or different programs or activities provided in accordance with this part, a recipient may not deny a qualified handicapped person the opportunity to participate in such programs or activities that are not separate or different.

(4) A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State."

45 C.F.R. § 84.4(a), (b) (1977).

The argument advanced by plaintiff is deceptively simple. Plaintiff would characterize medical assistance benefits for inpatient care as a single, unitary benefit, without regard to the particular illness or injury for which an individual requires such care. It is undisputed that section 443.1 of the Pennsylvania Public Welfare Code limits benefits for inpatient care in a private psy-

chiatric hospital to sixty days during any one "benefit period," but places no such limit on benefits for inpatient care in a general hospital. Pa.Stat.Ann. tit. 62, § 402 (Purdon Supp.1978); discussion *supra.* Thus, plaintiff concludes that he is being denied that which is available to all medical assistance recipients who require inpatient care in a general hospital, *i. e.,* benefits for inpatient care without any time limit.

In my view, this argument seriously misconceives the scope of section 504. I base this conclusion not on the legislative history of that provision, which is singularly unenlightening, but rather on a formal "analysis" of the Secretary's regulations interpreting section 504. That analysis, prepared by the Department of Health, Education, and Welfare, appears as Appendix A to part 84 of the Code of Federal Regulations, title 45, and it strongly suggests that the Pennsylvania Department of Public Welfare need not provide the same "unlimited" benefits for persons requiring inpatient care in private psychiatric hospitals that it provides for those requiring inpatient care in general hospitals.

Three passages from the Department's analysis are particularly relevant here. The first one, a commentary on 45 C.F.R. § 84.43(a) (1977), which applies to postsecondary educational programs and activities, reads as follows:

"The Department will continue to require that nondiscriminatory health services be provided to handicapped students. Recipients [of federal financial assistance] are not required, however, to provide specialized services and aids to handicapped persons in health programs. If, for example, a college infirmary treats only simple disorders such as cuts, bruises, and colds, its obligation to handicapped persons is to treat such disorders for them."

45 C.F.R., part 84, Appendix A, § 33. A second passage, which discusses 45 C.F.R. § 84.52(a), quoted earlier, is also instructive.

"One common misconception about the regulation is that it would require specialized hospitals and other health care providers to treat all handicapped persons. The regulation makes no such requirement. Thus, a burn treatment center need not provide other types of medical treatment to handicapped persons unless it provides such medical services to nonhandicapped persons. It could not, however, refuse to treat the burns of a deaf person because of his or her deafness."

45 C.F.R., part 84, Appendix A, § 36, ¶ 3. Finally, a third passage interprets 45 C.F.R. § 84.53 (1977), which was not included in the Department's original notice of proposed rulemaking.

"Section 84.53 is a new section that prohibits discrimination in the treatment and admission of drug and alcohol addicts to hospitals and outpatient facilities. . . This provision does not mean that all hospitals and outpatient facilities must treat drug addiction and alcoholism. It simply means, for example, that a cancer clinic may not refuse to treat cancer patients simply because they are also alcoholics."

45 C.F.R., part 84, Appendix A, § 37.

These three passages help to define the import of section 504 with respect to a provider of health or social services. They suggest that such a provider need do no more than provide handicapped persons with the same services it provides to nonhandicapped persons. *See generally* 45 C.F.R. § 84.52(a) (1977) (set out *supra*). To put the matter somewhat differently, they also suggest that such a provider need not extend a service that is limited to particular injuries or illnesses to all conditions that amount to a "handicap."

As I noted earlier, plaintiff would view medical assistance for inpatient care as a single, unitary benefit that may not be denied to a medical assistance recipient on the basis of the particular handicap (here, a schizo-affective reaction) that leads him to seek treatment. This argument proves entirely too much. By parity of reasoning, physician's services would also be viewed as a unitary benefit, and, on plaintiff's reading of section 504, a hospital or health care provider that received federal funds then

could not decline to treat *any* condition that amounted to a "handicap." Whether or not this result is desirable as a matter of social policy, the three passages quoted earlier rather clearly suggest that section 504 does not require such a result.

■ Although the Department's "analysis," from which those passages were taken, is a less certain guide to congressional intent than a detailed legislative history would ideally provide, it nevertheless is entitled to great weight here. For the legislative history of the Rehabilitation Act does establish that the Secretary's interpretative regulations were to play a central role in the administration and enforcement of section 504. As the District Court for the District of Columbia noted:

"The statute's discrimination prohibitions were certainly not intended to be self-executing. Reports from the Senate and the House on the 1974 Amendments to the Act indicate that Congress contemplated a swift implementation of § 504 through a comprehensive set of regulations."

*Cherry v. Mathews*, 419 F.Supp. 922, 924 (D.D.C.1976) (citations omitted).

Indeed, the *Cherry* court, based solely on the 1974 congressional reports, held that the Secretary was required to issue regulations effectuating section 504, although nothing in the Rehabilitation Act itself explicitly required such rulemaking. *Id.* To accept plaintiff's argument that section 504 requires defendants to extend benefits for "unlimited" inpatient care to all persons who are "handicapped" would entail the conclusion that the Department had fundamentally misunderstood the scope of that section in the context of health and social services. I cannot accept that conclusion absent some persuasive supporting evidence, and plaintiff has offered none.

Another external source—the structure of the Medicaid program created by Title XIX—provides additional evidence that plaintiff's argument misconceives congressional intent. "Title XIX establishes two groups of needy persons: (1) the 'categorically' needy, which includes needy persons with dependent children and the aged, blind, and disabled; and (2) the 'medically' needy, which includes other needy persons." *Beal v. Doe*, 432 U.S. 438, 440 n. 1, 97 S.Ct. 2366, 2369, 53 L.Ed.2d 464 (1977) (citations omitted). A state that participates in the Medicaid program *must* provide medical assistance to the "categorically needy," and *may*, at its option, extend coverage to the "medically needy," as Pennsylvania has done. *Id.* Title XIX also defines "medical assistance" as payment by the state of part or all of the cost of sixteen enumerated categories of care and services. 42 U.S.C.A. § 1396d(a)(1)–(16) (1974 & Supp.1978). Finally, a related provision requires that a state medical assistance plan provide "categorically needy" recipients with at least the care and services listed in clauses (1) through (5) of section 1396d(a); with respect to the "medically needy," however, a state plan must provide at least those five categories of care and service, or, alternatively, "the care and services listed in any 7 of the clauses numbered (1) through (16)" of that section. 42 U.S.C. § 1396a(a)(13)(B), (C) (Supp. V 1975).

These provisions together define the minimum obligations of a participating state with respect to various broad categories of medical care. Interestingly, clause (1) of section 1396d(a) refers to "inpatient hospital services (other than services in an institution for tuberculosis or mental disease)," which indicates that a participating state need not provide benefits for inpatient care in a psychiatric hospital even to "categorically needy" recipients. Clauses (14) and (16) of that same section refer to such inpatient care for, respectively, persons 65 years of age and older, and persons under 21 years of age. Under the Medicaid program, then, a state may obtain partial federal reimbursement if it chooses to provide medical assistance benefits for such care,[3]

---

3. It is undisputed that Pennsylvania's medical assistance plan provides "unlimited" benefits

for persons under 21 years of age, and for persons 65 years of age and older, who require

**630**

but participating states plainly are not *required* to provide such benefits to recipients in either category. Moreover, with respect to individuals who are 21 years of age or older, but who are under 65 years of age, a participating state not only is not required to provide benefits for inpatient care in a psychiatric hospital, but it receives no federal reimbursement if it should choose to provide such benefits. Indeed, defendants presented evidence at the hearing that Pennsylvania receives no federal reimbursement when it pays benefits for inpatient care in a psychiatric hospital to a recipient (such as plaintiff) who is 21 years of age or older, but who is under 65 years of age.

█ Finally, Title XIX contains another provision that "confers broad discretion on the States to adopt standards for determining the extent of medical assistance" to be provided under state plans. *Beal v. Doe,* 432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977). Section 1396a(a)(17) requires each state plan to "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan . . . which . . . are consistent with the objectives of [Title XIX]." Thus, although Title XIX does require participating states to provide medical assistance for certain enumerated categories of treatment, section 1396a(a)(17) negates any suggestion "that participating States are required to fund every medical procedure that falls within the delineated categories of medical care." *Beal v. Doe, supra,* 432 U.S. at 444, 97 S.Ct. at 2371.

In short, Title XIX establishes an intricate structure that governs state medical assistance plans. Congress, in drafting Title XIX, was especially careful to allow participating states considerable freedom in determining which services would be included in state plans, and, additionally, the extent to which particular services would be funded by state plans. Plaintiff's interpretation of section 504 would knock that carefully drafted structure into a cocked hat,

for it would require a state plan that afforded recipients "unlimited" inpatient care for *any* single illness or injury to provide identical benefits for every other illness or injury that qualifies as a "handicap" under the Rehabilitation Act. Significantly, it would also require such a plan to provide identical benefits for services, such as inpatient psychiatric care for persons between the ages of 21 and 65, that do not even qualify for federal reimbursement under the Medicaid statute. Again, whether or not this result would be desirable as a matter of social policy, plaintiff has not persuaded me that Congress, in enacting section 504, contemplated any such sweeping restrictions on state medical assistance plans. The manifest inconsistency between plaintiff's interpretation of section 504, on the one hand, and the congressional purpose evidenced by Title XIX, on the other hand, counsels rejection of plaintiff's argument.

█ For the reasons stated above, I find that plaintiff is unlikely to prevail on the merits of this statutory theory. Even if his argument were more persuasive, however, plaintiff would still face another difficulty, *i. e.,* his failure to exhaust administrative remedies. *See generally McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The Secretary's regulations under section 504 incorporate by reference "[t]he procedural provisions applicable to title VI of the Civil Rights Act of 1964." 45 C.F.R. § 84.61. (1977). Those provisions, particularly 45 C.F.R. § 80.8(d) (1977), require that a complaining party exhaust his administrative remedies with the Secretary of Health, Education, and Welfare before bringing a civil action to enforce compliance with title VI, or, in this case, with section 504. Plaintiff does not suggest that the available administrative remedies are inadequate, or that requiring exhaustion even at this stage would be futile. *See generally, e. g., NAACP v. Wilmington Medical Center, Inc.,* 426 F.Supp. 919, 924–25 (D.Del.1977). I add these obser-

inpatient care in a private psychiatric hospital. The challenged sixty-day limitation thus applies only to medical assistance recipients who

are 21 years of age or older, but who are under 65 years of age.

vations simply to help explain my conclusion regarding plaintiff's chances of ultimate success on the merits of his statutory theory.

## EQUAL PROTECTION OF THE LAWS

With respect to plaintiff's constitutional argument, I am again constrained to find a very slim possibility of ultimate success on the merits.

■ It cannot be gainsaid that the General Assembly of Pennsylvania, in drawing up the state's medical assistance plan, is subject to the strictures of the equal protection clause. *See Dandridge v. Williams,* 397 U.S. 471, 483, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). As the Court noted in *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977):

"The Constitution imposes no obligation on the States to . . . pay any of the medical expenses of indigents. But when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations."

432 U.S. at 469–70, 97 S.Ct. at 2380 (footnote omitted).

■ However, the critical question here, as in all equal protection cases, is whether the statute under attack "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 16, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); *see Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 319, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting). Plaintiff urges an affirmative answer to this question. Although he does not suggest that section 443.1 of the Pennsylvania Public

Welfare Code impinges on any fundamental right, plaintiff contends that "the mentally ill are a suspect class, subjecting any state legislation which uses mental illness as the basis for classification to strict analysis." Plaintiff's Memorandum of Law at 5.

■ I cannot accede to plaintiff's sweeping designation of "the mentally ill" as a suspect class for all purposes. Assuming for the moment that "the mentally ill" compose a discrete and unified class for purposes of equal protection analysis, several important differences exist between this class and the handful[4] of classes traditionally viewed as "suspect." An individual's race or nationality, for example, "is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (plurality opinion). By contrast, although heredity may play a part in determining whether an individual will suffer from some form of mental illness, the matter is not inevitably resolved at birth. Furthermore, race and nationality are considered "suspect" bases for legislative classification partly because an individual's race or nationality "frequently bears no relation to [his] ability to perform or contribute to society." *Id.* (footnote omitted). Indeed, Justice Brennan's plurality opinion in *Frontiero* expressly stated that this lack of correlation with an individual's ability is "what differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria [of race and nationality]." *Id.; accord, Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam). It appears self-evident that, on this dimension, mental illness must be grouped with intelligence and physical disability, which often bear importantly on an individual's ability, rather than with race or nationality, which do so only rarely.

---

**4.** Apart from race and nationality, only alienage has explicitly been deemed a suspect classification by a majority of the Supreme Court. *See, e. g., Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Moreover, the Court only recently held that

"[i]t would be inappropriate . . . to require every statutory exclusion of aliens to clear the high hurdle of 'strict scrutiny.'" *Foley v. Connelie,* 435 U.S. 291, at 295, 98 S.Ct. 1067, at 1070, 55 L.Ed.2d 287 (1978).

In view of these very substantial differences between mental illness, on the one hand, and the traditionally "suspect" bases for classification, on the other, I conclude that "the mentally ill" should not be treated as a suspect class for purposes of equal protection analysis. Thus, section 443.1 of the Pennsylvania Public Welfare Code should not be subjected to the "strictest" level of judicial scrutiny. *Mathews v. Lucas*, 427 U.S. 495, 509, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976).

Plaintiff urges, with some force, that "the mentally ill" historically have been "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School Dist. v. Rodriguez, supra*, 411 U.S. at 28, 93 S.Ct. at 1294. *See generally United States v. Carolene Prods. Co.*, 304 U.S. 144, 152–53 n.4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938). This contention raises any number of difficult questions that the parties here understandably have not addressed, given the time constraints inherent in a motion for preliminary injunctive relief. It may well be that, in some contexts, the asserted political powerlessness of "the mentally ill," or of some subgroups of that group, justifies the application of a standard of judicial review somewhat more stringent than the traditional "rational basis" standard. *Cf. Mathews v. Lucas, supra*, 427 U.S. at 510, 96 S.Ct. 2755 (standard of review applied to statute that discriminates against illegitimate children "is not a toothless one"). I need not resolve that issue here, however, for I have determined that section 443.1 is entirely consistent with the equal protection clause, whether it is judged by the rationality standard or by the somewhat more stringent test applied to classifications based on illegitimacy.

The background to the challenged statutory provision is instructive. Two years after Title XIX established the Medicaid program, the General Assembly of Pennsylvania enacted the Public Welfare Code, which outlined the Pennsylvania scheme of medical assistance and other public welfare benefits. Act No. 21, 1967 Pa. Laws 31. At the next legislative session, the Code was amended to prescribe in greater detail the benefits available under the medical assistance program. Act No. 273, 1968 Pa. Laws 904. In particular, section 443.1(1) imposed a sixty-day limitation on benefits for inpatient hospital care, without regard to the type of hospital involved. Section 443.1(4) further provided, as it still does, that "[c]are in a private mental hospital shall be limited to sixty days in a benefit period."

At its 1976 session, the General Assembly of Pennsylvania amended section 443.1(1) by removing the sixty-day limitation on benefits for inpatient care in a general hospital. Act No. 202, § 6, 1976 Pa. Laws 993. The sixty-day limitation on inpatient care in a private psychiatric hospital, contained in section 443.1(4), was left unchanged. At the hearing on this motion, defendants presented evidence that this differentiation was based on the availability of unlimited inpatient care in a state-run mental hospital to any person requiring inpatient care for a period of time exceeding sixty days. The availability of such care is not disputed here.

Thus, the General Assembly of Pennsylvania, in deciding how to allocate the funds available for its medical assistance program, determined that the sixty-day limitation on care in a private hospital struck an appropriate balance. Had the legislature chosen not to fund *any* private inpatient care, then indigent persons requiring only short-term care for acute problems would have had no choice but to use the state-run facilities. On the other hand, a decision to fund "unlimited" private inpatient care would have saddled the state treasury with the enormous costs of long-term private hospital care for persons with chronic illnesses, many of whom are unlikely to improve. Plaintiff understandably wishes that the Pennsylvania legislature had done more for persons requiring short-term care for periods exceeding sixty days. "But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking

the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970).

As the preceding discussion should make clear, the distinction drawn by section 443.1 is entirely rational. Moreover, no suggestion has been made that an invidious purpose underlies that statutory provision. That being so, "the Constitution does not empower [the federal courts] to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491 (1970) (citations omitted); *see Idaho Dept. of Employment v. Smith*, 434 U.S. 100, 101, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977) (per curiam).

Indeed, the legislative classification involved here is strikingly similar to the one upheld in *Legion v. Richardson*, 354 F.Supp. 456 (S.D.N.Y.) (three-judge court), *aff'd mem. sub. nom. Legion v. Weinberger*, 414 U.S. 1058, 94 S.Ct. 564, 38 L.Ed.2d 465 (1973). As originally enacted by Congress, the Medicaid and Medicare programs provided no federal benefits for inpatient care in a private mental hospital for persons under 65 years of age. In rejecting an equal protection challenge to this aspect of the benefit programs, the *Legion* court noted:

> "It is unnecessary to trace the entire legislative history of Medicare and Medicaid to conclude that there exists in this instance a rational justification for the exclusions and restrictions here challenged. At the time of the passage of Medicare and Medicaid, Congress had determined that advances made in treating mental patients were sufficient to indicate that many would soon be treated in facilities where more remedial benefits were available. Paralleling this determination was the belief by Congress that care of the mentally ill in state hospitals was the responsibility of the states."

354 F.Supp. at 459 (footnotes omitted). Thus, the result reached in *Legion*, and summarily affirmed by the Supreme Court, is strongly suggestive of the correct result in this case.

Finally, as I noted earlier, plaintiff's equal protection argument fares no better under the somewhat more stringent standard applied in recent cases involving illegitimacy than it fares under the traditional rationality standard articulated in *Dandridge v. Williams, supra*. Even under the more stringent standard, a state that chooses to dispense social welfare benefits retains considerable latitude in defining the class of recipients. *See, e. g., Califano v. Goldfarb*, 430 U.S. 199, 210, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1976) (plurality opinion). Although a reviewing court applying this standard will not lightly accept proffered justifications for criteria that differentiate between similarly situated persons, neither will it lightly set aside the legislative judgment that a particular group shall receive more than another group, or that a third group shall receive nothing at all. Where, as here, the legislature has differentiated between two groups of recipients made up of persons with entirely different kinds of illnesses and entirely different treatment needs, and has chosen to afford one group benefits for extended inpatient care in private hospitals, while affording the other group benefits for limited inpatient care in private hospitals and also affording it unlimited care in state-run hospitals, I cannot say that the equal protection clause has been violated.

For the reasons stated in this opinion, I conclude that plaintiff's likelihood of ultimate success on the merits is so slight as to preclude the issuance of preliminary injunctive relief. Accordingly, plaintiff's motion for a preliminary injunction will be denied. The findings of fact and conclusions of law required by Rule 52(a) are set out in the foregoing opinion.