**Thomas LESTRANGE, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant.**

**Civ. A. No. 78–944.**

United States District Court, M. D. Pennsylvania.

Nov. 4, 1980.

William Dempsey, Lenahan, Dempsey, Murphy & Piazza, Scranton, Pa., for plaintiff.

Dennis Alan Arouca, Assoc. Labor Counsel, Conrail, Philadelphia, Pa., Cody H. Brooks, Henkelman, Kreder, O'Connell & Brooks, Scranton, Pa., for defendant.

## MEMORANDUM

RAMBO, District Judge.

Plaintiff, who was employed by Erie Lackawanna Railroad Co. as an engineer prior to the amputation of his left hand and a portion of his left forearm in 1971, brings this action against defendant, successor in interest to the Erie Lackawanna Railroad, requesting injunctive relief, compensatory damages, punitive damages and attorney's fees. In his complaint, which was filed on September 22, 1978, plaintiff alleges defendant has violated the equal protection clause of the Fourteenth Amendment, the Civil Rights Act, 42 U.S.C. § 1983, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. On October 26, 1979, plaintiff filed an amended complaint to which defendant filed a motion to dismiss

on December 3, 1979, supported by a brief filed December 4, 1979. Plaintiff filed a reply brief on February 8, 1980.

Plaintiff alleges that shortly after the amputation of his left hand and a portion of his left forearm, he was refused employment (by Erie Lackawanna Railroad) without a hearing or medical examination. In 1973 defendant became the successor in interest to Erie Lackawanna Railroad pursuant to the Regional Rail Reorganization Act of 1973, 45 U.S.C. §§ 701–779 (hereafter Rail Act) receiving federal assistance in the form of "loans". Plaintiff alleges that from 1973 to April 4, 1978, defendant refused plaintiff employment without the benefit of a medical evaluation or a hearing. Plaintiff was examined by a physician on April 4, 1978 and was classified as not qualified for employment as an engineer by defendant on May 2, 1978. Plaintiff was afforded the opportunity to participate in a field test given by defendant on February 15, 1979. Defendant concluded that plaintiff failed the field test and plaintiff charged that the test was unfair. As a result, a second field test was scheduled but was not conducted as plaintiff refused to cooperate, alleging the second field test also was unfairly designed to disqualify him as an engineer.

In its motion, defendant contends plaintiff has failed to state a cause of action under the equal protection clause of the Fourteenth Amendment and 42 U.S.C. § 1983 as plaintiff has not alleged the required "state action" for the Fourteenth Amendment claim or "acting under color of state law" for the § 1983 claim. Plaintiff contends that defendant does operate under color of state law in that it is an interstate common carrier, uses public railways throughout the state, and has received federal financial assistance. Plaintiff concludes that if defendant uses state property and receives federal financial assistance, "one can hardly say that government action is not involved." (Plaintiff's brief, p. 5).

Plaintiff has apparently failed to make a distinction between "state action" and "government action," whether it be state or federal. Receipt of *federal* financial assistance has no bearing on whether defendant is operating under "color of *state* law. Further, the mere fact that a common carrier uses public property does not show "state action". Were that true, any private trucking company using state highways would be considered acting "under color of state law". The U. S. Supreme Court dealt with the issue of "state action" in regard to a regulated electric utility in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). In *Jackson* the Court stated:

> The mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so. *Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 462 [, 72 S.Ct. 813, 820, 96 L.Ed. 1068] (1952). It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be "state" acts than will the acts of an entity lacking these characteristics. But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. *Moose Lodge No. 107, supra* [407 U.S. 163] at 176 [92 S.Ct. 1965 at 1973, 32 L.Ed.2d 627]. The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test is met. *Id.* at 350–351, 95 S.Ct. at 453. (footnotes omitted) (citations omitted).

The Court went on to find that there was no relationship between the utility's action and its monopoly status as would establish "state action," that the utility was not performing a "public function" since there was no obligation on the state to furnish utility service, that the state utility commission's approval of the utility's general tariff did

not constitute state action, and that the state was not a joint participant in the utility's enterprise. In conclusion, the Court held:

> Metropolitan is a privately owned corporation, and it does not lease its facilities from the State of Pennsylvania. It alone is responsible for the provision of power to its customers. In common with all corporations of the State it pays taxes to the State, and it is subject to a form of extensive regulation by the State in a way that most other business enterprises are not. But this was likewise true of the appellant club in *Moose Lodge No. 107 v. Irvis, supra,* where we said:

> > "However detailed this type of regulation may be in some particulars, it cannot be said to in any way foster or encourage racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise." 407 U.S., at 176–177 [92 S.Ct., at 1973].

> All of petitioner's arguments taken together show no more than that Metropolitan was a heavily regulated, privately owned utility, enjoying at least a partial monopoly in the providing of electrical service within its territory, and that it elected to terminate service to petitioner in a manner which the Pennsylvania Public Utility Commission found permissible under state law. Under our decision this is not sufficient to connect the State of Pennsylvania with respondent's action so as to make the latter's conduct attributable to the State for purposes of the Fourteenth Amendment. *Id.,* 419 U.S. at 358, 95 S.Ct. at 457.

Plaintiff in the instant case has not been able to show that the actions taken by defendant are distinguishable from those taken by Metropolitan in the *Jackson* case, nor has plaintiff shown any other salient facts that would establish the requisite "state action" for a claim under the Fourteenth Amendment.

The requirement in § 1983 actions that the challenged activity be "under color of state law" is treated as equivalent to the "state action" requirement for actions under the Fourteenth Amendment. *Parks v. Mr. Ford,* 556 F.2d 132 (3rd Cir. 1977). Therefore, since defendant's activity did not constitute the required "state action" for purposes of the Fourteenth Amendment claim, it does not constitute "under color of state law" activity for the § 1983 claim. Plaintiff's Fourteenth Amendment claims, as well as his § 1983 claims, therefore, will be dismissed.

Defendant next moves to dismiss plaintiff's claim under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (hereinafter § 794). In essence, defendant contends that 42 U.S.C. § 2000d–3, which limits claims to those where a primary purpose of the federal funding was to provide employment, applies to the instant case and since creating employment was not a primary objective of the Regional Rail Reorganization Act of 1973, plaintiff has no cause of action under § 794. Defendant further argues that even assuming plaintiff did have a cause of action under § 794, his claim should be dismissed because plaintiff has failed to exhaust his administrative remedies.

Defendant does not contest that there is a right to bring a private action under § 794. Despite the absence of express statutory language to that effect, a private right to sue has been found to exist.[1] *Davis v. Bucher,* 451 F.Supp. 791 (E.D.Pa.1978); *Doe v. Colautti,* 454 F.Supp. 621 (E.D.Pa. 1978); *Trageser v. Libbie Rehabilitation Center, Inc.,* 590 F.2d 87 (4th Cir. 1978), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979); *Carmi v. Metropolitan St. Louis Sewer District,* 620 F.2d 672 (8th Cir. 1980). Defendant asserts, however, that any right to bring a private cause of action that may exist under § 794 is coextensive with those provided for in title VI of the 1964 Civil Rights Act. In support of

---

1. The United States Supreme Court in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) held that there is an implied right in actions brought under title IX of the 1964 Civil Rights Act, leaving little doubt of such a right under title VI.

this assertion, defendant points to § 120(a) of the Comprehensive Rehabilitation Services Amendments of 1978, codified at 29 U.S.C. § 794a(a)(2) which states:

> The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 504 of this Act [29 U.S.C. § 794].

In addition, several courts have held that the rights, remedies, and procedures available under § 794 are coextensive with those provided for in title VI of the Civil Rights Act of 1964. *Trageser, supra; Carmi, supra.* This court agrees in that finding.

Defendant further reasons that if the rights generated under § 794 are the same as those available under title VI, then any restrictions applicable to title VI are equally applicable to § 794. In particular, defendant contends that the restriction embodied in 42 U.S.C. 2000d–4, precludes plaintiff from stating a cause of action in the instant case. Section 2000d–4 provides:

2. 49 C.F.R. §§ 21.5(c)(1), (3) reads as follows:
   (c) Employment practices:
   (1) Where a primary objective of a program of Federal financial assistance to which this part applies is to provide employment, a recipient or other party subject to this part shall not, directly or through contractual or other arrangements, subject a person to discrimination on the ground of race, color, or national origin in its employment practices under such program (including recruitment or recruitment advertising, hiring, firing, upgrading, promotion, demotion, transfer, layoff, termination, rates of pay or other forms of compensation or benefits, selection for training or apprenticeship, use of facilities, and treatment of employees). Such recipient shall take affirmative action to insure that applicants are employed, and employees are treated during employment, without regard to their race, color, or national origin. The requirements applicable to construction employment under any such program shall be those specified in or pursuant to Part III of Executive Order 11246 or any Executive order which supersedes it.
   (3) Where a primary objective of the Federal financial assistance is not to provide employment, but discrimination on the grounds of race, color, or national origin in the employment practices of the recipient or

Nothing contained in this title [42 U.S.C. §§ 2000d–2000d–4] shall be construed to authorize action under this title [42 U.S.C. §§ 2000d–2000d–4] by any department or agency with respect to any employment practice of any employee, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

This section has been interpreted by the courts as precluding a judicial remedy under title VI unless "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Trageser, supra* at 89. (footnotes omitted). See also *Carmi, supra.* Further support of this view is found in 49 C.F.R. §§ 21.5(c)(1), (3) (1979).[2] Since actions brought under § 794 are subject to the same restrictions as are actions initiated under title VI, the restriction set out in 42 U.S.C. § 2000d·3, is applicable in the instant case.[3] This finding requires the determination of

other persons subject to the regulation trends, on the grounds of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the provisions of paragraph (c)(1) of this section shall apply to the employment practices of the recipient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.

3. Several courts have apparently not reached this conclusion. *Upshur v. Love,* 474 F.Supp. 332 (N.D.Cal.1979) (court stated the school district received substantial amounts of federal funds but made no finding of a primary purpose of funds); *Doe v. Colautti,* 454 F.Supp. 621 (E.D.Pa.1978) (no discussion of primary purpose); *David v. Bucher,* 451 F.Supp. 791 (E.D.Pa.1979) (no discussion of primary purpose). One court has required such a low threshold to establish that a primary purpose of the federal funds is to provide employment as to effectively render the "primary" requirement meaningless. *Guardians Association of N. Y. City Police Department, Inc. v. Civil Service Commission,* 466 F.Supp. 1273 (S.D.N.Y. 1979).

whether a primary objective of the Rail Act was to provide employment or whether the primary beneficiaries were discriminated against.

In 45 U.S.C. § 701(b), the purposes of the Rail Act are listed as follows:

(b) Purposes.–It is therefore declared to be the purpose of Congress in this Act to provide for–

(1) The identification of a rail service system in the midwest and northeast region which is adequate to meet the needs and service requirements of this region and of the national rail transportation system;

(2) the reorganization of railroads in this region into an economically viable system capable of providing adequate and efficient rail service to the region;

(3) the establishment of the United States Railway Association, with enumerated powers and responsibilities;

(4) the establishment of the Consolidated Rail Corporation, with enumerated powers and responsibilities;

(5) assistance to States and local and regional transportation authorities for continuation of local rail services threatened with cessation; and

(6) necessary Federal financial assistance at the lowest possible cost to the general taxpayer.

It is clear from the face of the statute that providing employment was not listed as a primary purpose of the Rail Act. This is not dispositive, however, of whether the primary beneficiaries are assured equality of opportunity and nondiscriminatory treatment. The "final system plan", with which defendant is obliged to comply if it desires to continue to receive federal assistance[4], lists as one of its goals "the minimization of job losses and associated increases in unemployment and community benefit costs in areas in the region presently served by rail service."

In *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), the Supreme Court held "it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the petitioner." Earlier, the Court indicated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957) (footnote omitted). See also *Mahone v. Waddle*, 564 F.2d 1018 (3rd Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). It is not clear beyond doubt that plaintiff could, under no set of facts, support his claim as set forth in the complaint. Although the court expresses no opinion on the matter, it is possible that plaintiff is a primary beneficiary under § 794 and is therefore entitled to equal opportunity and nondiscriminatory treatment. If that be the case and the field tests were conducted as plaintiff alleges, then there is a possibility plaintiff could prevail. Again, the court stresses that this finding is not on the merits but pertains only to the disposition of the motion to dismiss. Because of the foregoing, the court must deny defendant's motion to dismiss plaintiff's claims under § 794.

Defendant argues that even if plaintiff has stated a valid claim under § 794, his complaint should be dismissed because of his failure to exhaust administrative remedies. In light of the Supreme Court's ruling in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), it appears unlikely that exhaustion of administrative remedies would be required.[5] The Court rejected the argument that "individual suits are inappropriate in advance of exhaustion of administrative

---

**4.** 45 U.S.C. § 747, entitled "Protection of Federal Funds–(b) Report", provides that a report shall be submitted to Congress annually and shall include, *inter alia*, "the degree to which

the goals of section 206(a) of this act [45 U.S.C. § 716(a)] are being met.

**5.** Although *Cannon* is a case involving title IX, "the regulations implementing Section 504 [42

remedies," (*Id.* at 707 n. 41, 99 S.Ct. at 1963 n. 41), noting that "the individual complainant is not allowed to participate in the investigation or subsequent enforcement proceedings, that a voluntary compliance agreement need not include relief for a complainant, and that a complete cut-off of federal funds was not an appropriate remedy for an individual complainant." *Upshur v. Love*, 474 F.Supp. 332, 341 n. 23 (N.D.Cal. 1979) (citing *Cannon, supra* at 708 n. 41).

The court in *Upshur* found, however, that it need not decide whether or not plaintiff in a § 794 action must exhaust administrative remedies, since at the time the complaint was filed no administrative remedies were available. *Upshur, supra* at 341. The administrative remedies available to the plaintiff in the instant case did not take effect until July 2, 1979. Plaintiff filed his complaint on September 22, 1978. Even if exhaustion of administrative remedies is required for claims under § 794, that requirement would not be applicable in the instant case. Defendant's motion to dismiss for failure to exhaust administrative remedies will be denied.

U.S.C. § 794] adopt the title VII enforcement procedures, 45 C.F.R. § 84.61, the same administrative mechanisms used to enforce title IX, 45 C.F.R. § 86.71. Thus the concerns expressed by the Court in *Cannon* with respect to the adequacy of title IX administrative remedies would also apply to complaints under Section 504 [42 U.S.C. § 794]." *Upshur v. Love*, 474 F.Supp. 332, 341 n. 23 (N.D.Cal.1979).