**UNITED STATES of America,**
**Petitioner-Appellee,**

v.

**CABRINI MEDICAL CENTER,**
**Respondent-Appellant.**

No. 358, Docket 80–6166.

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1980.
Decided Jan. 27, 1981.

Martin D. Heyert, New York City (Kelley Drye & Warren, Patrick W. McGovern, New York City, of counsel), for respondent-appellant.

Jane E. Bloom, Asst. U. S. Atty., S. D. New York, New York City (John S. Martin, Jr., U. S. Atty., S. D. New York, Dennison Young, Jr., Peter C. Salerno, Asst. U. S. Attys., New York City, of counsel), for petitioner-appellee.

Before LUMBARD, MULLIGAN and VAN GRAAFEILAND, Circuit Judges.

LUMBARD, Circuit Judge:

Cabrini Medical Center ("Hospital") appeals from an order of June 25, 1980, by Judge Owen of the Southern District of New York, 497 F.Supp. 95, which directed the Hospital to grant the Government access to its records and other data concerning Esperanza Polanco. Polanco, a former unskilled laundry employee of the Hospital, alleges he was discharged because of a mental disability. The Government contends that the Department of Health and Human Services's Office for Civil Rights ("OCR") is authorized to investigate Polanco's complaint under § 504 and § 505(a)(2) of the Rehabilitation Act of 1973, 29 U.S.C. § 794, 794a(a)(2), as amended. We conclude that the Hospital's receipt of Medicare and Medicaid funds does not constitute receipt of financial assistance under the Rehabilitation Act, because its primary objective was not to provide employment. Accordingly, we reverse the order, dismiss the Government's petition and direct that the Hospital's cross-petition be granted.

The Hospital, located on East 19th Street in New York City, comprises a 478 bed, non-profit, acute-care hospital and a 100 bed nursing home. It had employed Polanco in its laundry from 1970 to 1977, during which Polanco took Valium to quiet his nerves. On October 1, 1977 Polanco lost his temper with a faucet that did not work to his satisfaction while washing his hands, and he clubbed the faucet with a cane until he broke it. The Hospital discharged him October 7 when its investigation showed that Polanco had broken the $80 faucet deliberately. At a hearing on October 18, 1977, Polanco's union, District 1199, admitted that Polanco had broken the faucet and decided not to pursue the matter further by arbitration.

When Polanco filed a claim for unemployment insurance benefits in January 1978, he was disqualified on the ground that he had been discharged for misconduct. Polanco had claimed that the Hospital discharged him because of his alleged disability. Both the New York State Unemployment Insurance Appeal Board and the New York State Division of Human Rights ruled against him. Despite these rulings, OCR chose to conduct its own inquiry and, upon the Hospital's refusal to allow OCR to investigate, the Government brought this action on February 25, 1980. The hospital answered and cross-petitioned, alleging that § 504 did not authorize OCR to investigate.

The district court granted the Government's petition and dismissed the

cross-petitions. From its review of the pertinent statutes, it concluded that Congress intended to protect the rights of handicapped persons broadly and that § 504 was designed to eliminate discrimination under any program or activity receiving federal assistance "without regard to the purpose for which the funds were received." Pending determination of the Hospital's appeal, the district court stayed its order enjoining the Hospital to permit OCR access to investigate.

We conclude that the statutory scheme was not meant to authorize the Government to investigate the Hospital, because the primary objective of the Government's Medicare and Medicaid payments was not that of providing employment.

Initially, the Government's challenge to the Hospital's standing can be summarily dismissed. The Government argues that OCR should be allowed to investigate—even though there may be a serious question about OCR's jurisdiction to investigate Polanco's discharge—in order to establish whether the primary objective of the Federal assistance was to provide employment. *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047 (2d Cir. 1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974), cited in support of this proposition, is not on point. There, the basic operating facts were unknown; here the statute and the nature of the payments are determined and not disputed.

Nor does the recent decision in *Federal Trade Commission v. Standard Oil Company of California*, —— U.S. ——, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), benefit the government. The plaintiff oil companies in that case sought judicial review of an F.T.C. complaint where no one questioned the statutory authority of the agency to investigate those companies. The Court held that the complaint was not a reviewable final order and that the agency should have the chance to evaluate the facts itself to determine if the charge had merit. Here, only the purely legal question of statutory jurisdiction was before the district court; nothing OCR's intended investigation might reveal could create jurisdiction if it does not exist on the facts before us. We are not second-guessing OCR's investigative skills but rather determining whether it seeks to exercise those skills in an unauthorized manner. We see no point in permitting the Government to institute an investigation with its attendant inconvenience, expense, and annoyance if there is and can be no authority for undertaking it.

The language of §§ 504 and 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a (a)(2), at first blush seems broad enough to cover Polanco's case as it speaks of "any program or activity receiving Federal financial assistance." However, the provisions of Title VI, as incorporated by § 505(a)(2), make it clear that the federal agencies are to concern themselves with investigation and enforcement only where the "primary objective of the Federal financial assistance is to provide employment."

The general language of § 504 provides:

No otherwise qualified handicapped individual in the United States, as defined in Section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ... The head of such [funding] agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978....

29 U.S.C. § 794. Section 505(a)(2) provides remedies:

The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such under section 794 of this title.

29 U.S.C. § 794a(a)(2). But Title VI of the Civil Rights Act of 1964, which the Act incorporates, specifically limits the action of federal departments or agencies to employment practices in programs receiving Federal financial assistance that has a primary objective of providing employment. Section 604 of Title VI provides:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d–3. The only money the Hospital receives from the Federal Government consists of Medicare and Medicaid payments for treatment of the Hospital's patients. It cannot be said that a primary purpose of these payments is to provide employment.

The Fourth and Eighth Circuits, in opinions which the district court disregarded, have construed the statutes in question as we do. In *Trageser v. Libbie Rehabilitation Center, Inc.*, 590 F.2d 87 (4th Cir. 1978), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979), the court found no reason for disregarding the explicit incorporation of § 604 of Title VI and affirmed dismissal of the complaint of a former employee of a health care institution who claimed she had been illegally forced to resign because of poor eyesight. The court held that in such a case there could be no allegation that a primary objective of the Medicare, Medicaid and Veterans payments received by the institution was to provide employment.

More recent is the Eighth Circuit decision in *Carmi v. Metropolitan St. Louis Sewer District*, 620 F.2d 672 (8th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980), which adopted the Fourth Circuit's analysis in *Trageser, supra. See also Brinkley v. Department of Public Safety*, 22 FEP Cases 164 (N.D.Ga. Jan. 25, 1980); *Silverstein v. Sisters of Charity*, 38 Colo.App. 286, 559 P.2d 716 (1979); *Zorick v. Tynes*, 372 So.2d 133 (Fla.App.1979). See also the decisions of the Seventh and Eighth Circuits holding that an employee who did not participate in, or qualify for, his employer's federally assisted programs may not bring a claim for employment discrimination under § 504 of the Rehabilitation Act. *Simpson v. Reynolds Metals Co.*, 629 F.2d 1226 (7th Cir. 1980); *Carmi v. Metropolitan St. Louis Sewer District, supra.* The only case providing any support for the district court is *Hart v. County of Alameda*, 485 F.Supp. 66 (N.D.Cal.1979).

█ Nor do we think that the Hospital's signing of an "Assurance of Compliance" in July 1977, a prerequisite for Federal financial assistance, in any way precluded it from challenging OCR's right to regulate its employee relations. The Hospital was assured by General Counsel of HEW that this Assurance did not waive any legal rights of the Hospital, which in our view, would include the right to question the exercise of powers not granted to OCR by statute.

Accordingly, we reverse and remand with directions to dismiss the Government's petition and to grant the Hospital's petition.