Thomas LE STRANGE, Appellant,

v.

CONSOLIDATED RAIL CORPORATION, Appellee.

No. 81–2943.

United States Court of Appeals, Third Circuit.

Submitted under Third Circuit Rule 12(6) June 8, 1982.

Decided Sept. 1, 1982.

Joseph P. Lenahan, Lenahan & Dempsey, Scranton, Pa., for appellant.

Lorraine C. Staples, Dennis J. Morikawa, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee.

Before ADAMS and WEIS, Circuit Judges, and BLOCH *, District Judge.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

BLOCH, District Judge.

Plaintiff brought suit, pursuant to § 504 of the Rehabilitation Act of 1973, claiming he was denied employment by the defendant because he is handicapped. Section 504, 29 U.S.C. § 794, provides: "No otherwise qualified handicapped individual . . . shall . . . be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." Although the lower court dismissed plaintiff's action because he lacked standing to bring his suit, we think the question posed by this appeal is, in fact, whether § 504's prohibition against discrimination by federal grantees encompasses a ban against employment discrimination.

### I

The lower court concluded plaintiff did not have standing to sue defendant for employment discrimination "unless 1) providing employment is a primary objective of the federal aid received by the defendant, or 2) discrimination in employment necessarily causes discrimination against primary beneficiaries of the federal aid." LeStrange v. Consolidated Rail Corp., 501 F.Supp. 964 (M.D.Pa.1981). The court further refined the first prong of its standing test to require the plaintiff to show he is a primary beneficiary of the federal aid received by the defendant, and that the primary objective of the federal aid be to create new jobs, and not merely to maintain employment or to compensate for lost jobs.

Plaintiff could not meet either of the two prongs of the lower court's standing test.

This standing test had its genesis in the case of Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87 (4th Cir. 1978). The Trageser analysis has since been adopted by the Eighth Circuit in Carmi v. Metropolitan St. Louis Sewer District, 620 F.2d 672 (8th Cir. 1980), the Second Circuit in United States v. Cabrini Medical Center, 639 F.2d 908 (2nd Cir. 1981), and the Ninth Circuit in Scanlon v. Atascadero State Hospital, 677 F.2d 1271 (9th Cir. 1982). Trageser and its progeny rely on § 505(a)(2) of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978, amending the Rehabilitation Act of 1973, which provides:

> "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such . . ."

29 U.S.C. § 794a(a)(2).

Title VI served as the model for § 504 of the Rehabilitation Act. Section 601 of Title VI provides:

> "No person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000d.

Section 602 of Title VI authorizes federal departments and agencies to promulgate regulations to enforce § 601's prohibition against discrimination, including regulations providing for the termination of federal funding in the event of non-compliance, id., § 2000d–1. However, § 604 provides:

> "Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or

* The Honorable Alan Bloch, United States District Judge for the Western District of Pennsylvania, sitting by designation.

agency with respect to any employment practice of any employer ... except where a primary objective of the Federal financial assistance is to provide employment."

*Id.*, § 2000d–3.

*Trageser* concludes, first, that § 604 limits not only agency action, but also the actions of private litigants. It then concludes that the remedies, procedures and rights of Title VI extended to the victims of handicap discrimination by the 1978 amendments to the Rehabilitation Act includes § 604's limitation on the right to bring an action for employment discrimination.

The lower court reformulated the *Trageser* holding into a test for standing, peculiar to § 504 actions. We see no reason to formulate any test for standing for § 504 actions other than that promulgated by the Supreme Court for general application, that is (a) does the plaintiff allege "that the challenged action has caused him injury in fact, economic or otherwise;" and (b) "[is] the interest sought to be protected by the complainant ... arguably within the zone of interests [sought] to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 152–53, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The relevant question on this appeal would then be whether plaintiff's interest in being free from employment discrimination falls within the zone of interests sought to be protected by § 504. However, the correct formulation of the test for standing for § 504 actions is not the crucial issue presented by this appeal. For however the test is formulated, the crucial issue is whether § 504, as amended in 1978, covers employment discrimination against the handicapped by federal grantees.

## II

The Supreme Court recently confronted this same issue within the context of Title IX of the Education Amendments of 1972, and we believe its approach in *North Haven Board of Education v. Bell*, —— U.S. ——, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), dictates our approach in this case.

Section 901(a) of Title IX, like § 504 of the Rehabilitation Act, is modeled after § 601 of Title VI of the Civil Rights Act. It provides:

"No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...."

The Department of Education promulgated regulations pursuant to Title IX, prohibiting federally funded education programs from discriminating in employment on the basis of gender. Two Connecticut public school boards brought separate suits challenging its authority to issue the regulations, arguing Title IX was not meant to reach the employment practices of educational institutions.

The Supreme Court began its analysis by focusing on the statutory language, concluding first that "[A] female employee who works in a federally funded education program is 'subjected to discrimination under' that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues," *id.* —— U.S. at ——, 102 S.Ct. at 1917, and, therefore, that, "Because § 901(a) neither expressly nor impliedly excludes employees from its reach, we should interpret the provision as covering and protecting these 'persons' unless other considerations counsel to the contrary," *id.* To determine whether "other considerations counsel to the contrary," the Supreme Court looked to the legislative history "for evidence as to whether Congress meant somehow to limit the expansive language of § 901," *id.* The Court found no such evidence and held, "Title IX proscribes employment discrimination in federally funded education programs," *id.* —— U.S. at ——, 102 S.Ct. at 1926.

## III

The statutory language of § 504 of the Rehabilitation Act and § 901 of Title IX

being virtually identical, we are bound to conclude, like the Supreme Court in *North Haven*, that because § 504 "neither expressly nor impliedly excludes employees from its reach, we should interpret the provision as covering and protecting these 'persons' unless other considerations counsel to the contrary." For like female employees, handicapped employees are "subjected to discrimination under" a federally funded program if they are paid lower salaries, given less opportunity for promotion, or forced to work under more adverse conditions than are their non-handicapped colleagues. Similarly, a handicapped individual is certainly "subjected to discrimination under" a federally funded program if, as alleged in our case, he is not hired at all, solely because of his handicap.

Of course, *Trageser* and the courts which have followed it, including the lower court in this case, find counsel to the contrary in § 505(a)(2) of the 1978 amendments to the Rehabilitation Act, extending the remedies, procedures and rights of Title VI to victims of handicap discrimination. Title IX contains no provision similar to § 505(a)(2). *Trageser* would also argue that § 505(a)(2) should be read together with § 505(a)(1), 29 U.S.C. § 794a(a)(1), extending the remedies, procedures and rights of Title VII to victims of handicap discrimination by the federal government. The failure of Congress to extend Title VII to victims of discrimination by federal grantees indicates to the *Trageser* court its intention to limit the scope of § 504 to discrimination other than employment discrimination. We do not believe that the statutory language of § 505(a)(2), even when read in the context of § 505(a)(1), indicates a desire to narrow the scope of § 504. For this reason, we

would nonetheless find § 504 prohibits employment discrimination by federal grantees unless anything in the legislative history of either § 504 or § 505(a)(2) counsels to the contrary.

Section 505(a)(2) extends the remedies, rights and procedures of Title VI to (1) persons; (2) aggrieved by any act or failure to act by either a recipient or a provider of federal funds. Title VI consists of six provisions,[1] and the only one which extends to *persons* any rights or remedies is § 603, 42 U.S.C. § 2000d–2, providing for judicial review of agency action.

The plain words of § 604 limit its application to departments or agencies. Given the statutory scheme of which Title VI is a part, it is not illogical to assume Congress intended precisely what it said and no more. Title VI is, of course, a part of the 1964 Civil Rights Act. The 1964 Civil Rights Act also has a Title VII, which deals exclusively with employment discrimination. In 1964, it prohibited employment discrimination on the basis of race, color or national origin by *any* employer with 15 or more employees working each working day for at least 20 weeks. Obviously, the sweep of Title VII is far broader than Title VI. Clearly, Title VI was never meant to be a prime tool for the enforcement of employment rights.

Title VII created a new federal agency, the Equal Employment Opportunity Commission, to battle employment discrimination. Without the limiting language of § 604, Title VI threatened to engage every other department and agency in the same battle, with the potential danger of varying rules regulations and strategies.

1. The first provision of Title VI, § 601, 42 U.S.C. § 2000d, is the declaration prohibiting discrimination on the basis of race, color or national origin by federal grantees. The second provision, § 602, *id.* § 2000d–1, authorizes federal departments and agencies to issue rules, regulations and orders to effectuate the initial prohibition against discrimination. Section 602 also provides that compliance with the regulations may be effected by the termination of federal funding. It further provides for a number of procedures clearly designed, not to protect the victim of discrimination, but the federal grantee. Section 603, *id.* § 2000d–2, provides for judicial review of agency action. Section 604, *id.* § 2000d–3, prohibits any department or agency from terminating funds for employment discrimination unless a primary goal of the federal program involved is to provide employment. Section 605, *id.* § 2000d–4, exempts from the scope of Title VI programs which receive federal financial assistance by way of a contract of insurance or guaranty.

The question of whether § 604 also limited the rights of private litigants was unlikely to even occur to the Congress. The only reason for a private litigant to sue for employment discrimination under Title VI is that he failed to meet the administrative requirements to bringing suit under Title VII. Even then, an action brought pursuant to 42 U.S.C. § 1983 may provide a wider range of remedies than a Title VI action.[2]

As to the implications raised by § 505(a)(1), extending the remedies, procedures and rights of Title VII to victims of discrimination by the federal government, closer analysis undermines the *Trageser* argument that this too indicates Congressional intent to limit § 504 to discrimination other than employment discrimination.

Section 505(a)(1) extends particular provisions of Title VII to individuals aggrieved by the final disposition of a complaint brought pursuant to § 501 of the Rehabilitation Act. Section 501 requires federal departments, agencies and instrumentalities, including the Postal Service, to develop an affirmative action plan for the hiring, placement and advancement of handicapped individuals. Handicapped employees or prospective employees aggrieved by agency action or inaction may file a complaint with the agency. The particular provisions of Title VII referred to in § 505(a)(1) extend to complaining individuals the right to appeal an adverse agency decision to the EEOC and then to bring a civil action in court. The various provisions prescribe various time limitations on agency action and the filing of appeals and civil suits. They further proscribe various court procedures.

Section 505(a)(1) refers alleged victims of employment discrimination on the basis of handicap in the federal government to the very sections of Title VII dealing with employment discrimination on the basis of race, color, religion, sex or national origin in the federal government. Section 505(a)(1) asks the EEOC to do what it is already doing for victims of employment discrimination on one basis for victims of employment discrimination on another basis. The question before the EEOC in either case is the same: was this person discriminated against in the making of some employment decision? Once the EEOC has made its determination, the alleged discriminatee, if dissatisfied, may go to court.

In contrast, extending Title VII rights, remedies and procedures to victims of discrimination by federal grantees would present a host of new issues to the EEOC. First, it would take it beyond the realm of employment discrimination for the first time, to discrimination in housing, access, education, etc. Second, it would ask it to resolve the issue of what is a federally-funded program or activity, a question with which it has no familiarity.

The failure of Congress to extend Title VII to victims of § 504 discrimination was obviously intended simply to short-circuit the EEOC, and for obvious reasons. Reading into the statutory framework of § 505 an intention to drastically narrow the scope of § 504 is a strained interpretation of an otherwise reasonably constructed provision. Support should be found in the legislative history before we should stretch so far.

IV

In order to be certain that Congress intended what the broad sweep of its language in § 504 indicates, we must undertake a two-step analysis of legislative history. Section 504 should be read to prohibit employment discrimination "unless other considerations counsel to the contrary." Considerations counselling to the contrary may be found in the legislative history of § 504 of the Rehabilitation Act of 1973 or the legislative history of the 1978 amendments, which introduced § 505(a)(2) to the Act. We begin with the 1973 legislative history. Because we believe nothing in that

---

2. Some courts have decided that a Title VI litigant is entitled to declaratory and injunctive relief only, and not monetary damages. *Drayden v. Needville Independent School Dist.*, 642 F.2d 129 (5th Cir. 1981); *Concerned Tenants Ass'n. v. Indian Trails Apartments*, 496 F.Supp. 522 (N.D.Ill.1980).

history indicates Congress intended anything less than it said, we then turn to the history of the 1978 amendments to determine if Congress, at that point, intended to narrow the scope of its prior enactment.

## A

The legislation which would eventually become the Rehabilitation Act of 1973 was considered and passed by the Congress three times before it was finally signed into law by President Nixon on September 26, 1973. Sen.Rep.No. 93–318, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Ad.News 2076, 2086–2090 [hereinafter cited at Sen.Rep.No. 93–318]. A provision prohibiting discrimination against the handicapped by federal grantees was part of all three measures, *id.* at 2078–2082, although it was not part of the original resolution passed in 1972 by the House. Comm. of Conf.Rep.H.R. 8395, 92d Cong., 2d Sess., *reprinted in* 118 Cong.Rec. 35141, 35163.

All versions of the legislation were lengthy, the first two even lengthier than the third. Certainly, the primary purpose of the legislation was to extend the 53-year old vocational rehabilitation program, for another period of years, with a new mandate, in the original two bills, to give priority to the severely handicapped. In addition, the bills as originally submitted to the President authorized a program which, for the first time, would have provided rehabilitation services to severely handicapped individuals with no feasible vocational goals. In addition, the original two bills would have created a series of other new programs concentrating on particular subgroups of the handicapped, such as older deaf and blind individuals, individuals with spinal cord injuries and individuals with end-stage renal disease. Finally, the bills would have mandated certain research and created a number of federal bodies to deal with particular problems of the handicapped. Sen.Rep.No. 93–318, 1973 U.S. Code Cong. & Ad.News at 2078–2079.

The first bill was pocket vetoed by the President on October 27, 1972. 118 Cong. Rec. 37203. The second bill was vetoed on March 27, 1973, 119 Cong.Rec. 9307, and the Senate failed to override the veto a week later, *id.* at 10794. Serious negotiations between the Administration and, primarily, the Senate then began. Sen.Rep.No. 93–318, 1973 U.S.Code Cong. & Ad.News. at 2082.

The President's primary objection to the original two bills was that they authorized what he considered to be an excessive and inflationary amount of money to fund the proposed programs. He also objected to what he saw as a change of focus in the highly successful vocational rehabilitation program by requiring priority be given to the severely handicapped. He also opposed the proliferation of categorical grants to fund the new programs and the proliferation of federal commissions, councils and divisions. 118 Cong.Rec. 5880 (first veto memorandum); 119 Cong.Rec. 24570 (second veto memorandum). The final bill that was to become law was trimmed from seven titles to five. It required only that vocational rehabilitation programs give equal, not priority, treatment to the severely handicapped, eliminated all the proposed new programs, including the non-vocational rehabilitation program, eliminated most of the new federal bodies which would have dealt with the problems of the handicapped, and, of course, significantly lowered the amount of money authorized to fund the remaining legislation. Sen.Rep.No. 93–318, 1973 U.S.Code Cong. & Ad.News at 2079–2082.

At no time was there any dispute between the Administration and the Congress over the wisdom of the non-discrimination provision which would eventually be codified in § 504. Neither was it ever a matter of controversy between the Senate and the House. Although it was not part of the first House resolution, the Senate version was accepted in conference with no more than the notation, "The House recedes." 118 Cong.Rec. 35163.

It is not surprising, therefore, that despite the pages of legislative history generated by an act debated and passed three times by Congress, that there is little refer-

ence to § 504. There is *no* direct reference indicating that § 504 was not meant to cover employment discrimination. However, there are several both direct and indirect references indicating the contrary.

The Rehabilitation Act was born in the Senate in the newly constituted Subcommittee on the Handicapped of the Committee on Labor and Public Welfare. The subcommittee was charged with examining *all* issues related to the handicapped, not just those raised by the vocational rehabilitation program. 119 Cong.Rec. 5882. The expanded focus of the bill which was reported by the subcommittee was certainly due, in part, to the wide focus of the subcommittee's mandate. The legislative history indicates one of the problems of the handicapped addressed by the subcommittee was the problem of employment discrimination.

Senator Cranston, who chaired the subcommittee for the purpose of considering the legislation extending the vocational rehabilitation program, commented during debate on various criticisms of the program which he felt could not be handled simply by amending the Vocational Rehabilitation Act itself. "Such problems as *unfounded discrimination in employment* and in housing, difficulties of access to places of work and treatment centers, and duplication and fragmentation of services across program lines were voiced repeatedly to the committee," he noted (emphasis added). *Id.*[3]

Discrimination in employment has a particularly detrimental impact on the vocational rehabilitation program, Senator Cranston noted:

"[D]iscrimination in placement, hiring and advancement continue to limit the vocational rehabilitation program's ability to effect successful rehabilitations ... The expenditure of money on vocational rehabilitation programs is not well spent if we do not at the same time take meaningful steps to eliminate architectural barriers and provide substantial accomplishments in employment for handicapped individuals."

*Id.*

These sentiments of Senator Cranston expressed during debate on the second incarnation of the act were echoed by Senator Taft during debate on the third incarnation of the act:

The basic purpose of vocational rehabilitation continues to be to help physically and mentally handicapped individuals achieve the ability to work, earn, and live independently in their communities. Yet in spite of the relatively high success of this program, we still have a long way to go ... Too many handicapped Americans are not served at all, too many lack jobs, and too many are underemployed—utilized in capacities well below the levels of their training, education, and ability. However, if we are to assure that all handicapped persons may participate fully in the rewards made possible by the vocational rehabilitation program, we must devote more of our energy toward the elimination of the most disgraceful barrier of all—discrimination.

*Id.* at 24587.

And, clearly, the Rehabilitation Act addressed the problem of employment discrimination. As described by Senator Javits, co-sponsor of the act, a member of the subcommittee and ranking minority member of the parent Committee on Labor and Public Welfare, "This measure draws upon the experience of the past half century and provides new emphasis on the severely handicapped, the homebound, client services and participation, *opportunities for employment of the handicapped* and administration improvements" (emphasis added). *Id.* at 5887. The bill as originally reported and ultimately enacted into law provided, in sections immediately preceding § 504, for affirmative action programs to encourage the hiring of the handicapped by the federal government, 29 U.S.C. § 791(b) and federal contractors, 29 U.S.C. § 793. It is hard to

---

3. *See also,* the remarks of Senator Stafford, the ranking minority member of the subcommittee, 119 Cong.Rec. 5893; and Sen.Rep.No. 93–318, 93d Cong. 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Ad.News 2076, 2078.

imagine, in an Act whose primary goal is to enhance the vocational capabilities of the handicapped, that if the legislature had intended to limit the reach of a provision which immediately follows two sections whose express purpose is to encourage the hiring of the handicapped, that someone somewhere in the legislative history would not have said so. On the contrary, several members indicated the opposite.

During debate on the original bill, Senator Javits highlighted several new areas of federal responsibility recognized by the legislation: "I refer, for example, to ... provisions for encouraging hiring of the handicapped under Federal contracts and Federal grants." 118 Cong.Rec. 32305. Senator Humphrey reviewed those provisions requiring affirmative action by federal contractors and prohibiting discrimination by federal grantees and found they embodied the intent of bills he had introduced earlier which would have amended both Titles VI and VII of the 1964 Civil Rights Act to include the handicapped. *Id.* at 32310. Finally, Senator Williams, chairman of the full Committee on Labor and Public Welfare, during debate on the third version of the bill, reviewed provisions retained from the first two versions, including, "prohibitions against discrimination in employment in programs assisted with Federal funds." 119 Cong.Rec. 24588.

These few direct references to § 504 support the conclusion that the intent of Congress matched the broad sweep of its language. We turn now to the question of whether Congress intended to narrow the scope of § 504 by the 1978 amendments, specifically § 505(a)(2).

### B

Section 505(a)(2) originated in the Senate and was adopted by the Committee of Conference assigned to reconcile the Senate and House versions of the 1978 amendments to the Rehabilitation Act. House Conf. Rep.No. 95–1780, 95th Cong.2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad.News 7312, 7375, 7404. Although the Joint Explanatory Statement of the Committee of Conference offers no assistance in interpreting the provision, noting only that the House receded in its opposition to § 505(a)(2), *id.*, the report of the Senate Committee on Human Resources accompanying the original Senate bill discusses the purpose of the provision.

The Senate Committee notes that the then Department of Health, Education and Welfare had recently issued regulations enforcing the prohibition against handicap discrimination by federal grantees embodied in § 504. These regulations are particularly noteworthy because HEW was assigned the task, by executive order, of coordinating the issuance of regulations enforcing § 504 by all federal departments and agencies. These regulations, subsequently codified at 45 C.F.R. § 84.1 *et seq.*, prohibited discrimination in employment practices, *id.* at § 84.11. Nonetheless, the Committee stated:

> It is the committee's understanding that the regulations promulgated by the Department of Health, Education, and Welfare with respect to procedures, remedies, and rights under section 504 conform with those promulgated under title VI. *Thus, this amendment codifies existing practice as a specific statutory requirement.*

Sen.Rep.No. 95–890, 95th Cong.2d Sess., p. 19 (emphasis added).

The committee further stated that applying the provisions of Title VI to § 504 of the Rehabilitation Act would assure "administrative due process, and provide for administrative consistency within the Federal Government." *Id.*

The committee report contains nothing that would indicate it felt HEW exceeded its statutory authority by prohibiting employment discrimination in its recently promulgated regulations. Similarly, no one during the debate in the Senate or House suggested HEW had gone too far. In fact, the only Congressman who directly mentioned the regulations during debate, Representative Dodd, "strongly supported the long-delayed issuance of the section 504 regulations believing then, as now, that the protections they establish for the handicapped are very much needed." 124 Cong. Rec. 13905.

Several proposed amendments to the act, and the debate on them, further indicate that Congress understood § 504 to reach employment discrimination, when enacted and as amended. For example, Senator Cannon proposed during debate an amendment which, for the purpose of § 503 and § 504 of the Rehabilitation Act, would exclude from the definition of handicapped individual an alcoholic or drug abuser "whose condition of alcoholism or drug abuse renders that individual not qualified for employment ..." The purpose of Senator Cannon's amendment, which was eventually passed and codified at 29 U.S.C. § 706(7)(B), was: "To exclude alcoholics and drug abusers from certain employment provisions of the Rehabilitation Act ..." 124 Cong.Rec. 30322. Its scope was considerably narrower than a similar measure proposed in the House which would have excluded alcoholics and drug abusers from the definition of handicapped individuals altogether, regardless of whether their condition impacted on their employability or not.

Clearly, Senator Cannon believed § 504 reached employment discrimination, and nobody during the debate on his argument suggested otherwise. More specifically, nobody suggested that if § 504 had at one time reached employment discrimination, the proposed § 505(a)(2) would have the effect of eliminating it from its scope. Senator Williams, chairman of the Committee on Human Resources, spoke in support of Senator Cannon's amendment, which he felt necessary "because of misunderstandings and distortions concerning employment rights of alcoholics and drug dependent persons." *Id.* at 30323. Senator Williams felt the amendment "would reassure employers that it is not the intent of Congress to require any employer to hire a person who is not qualified for the position or who cannot perform competently in his or her job." *Id.*

Senator Hathaway also spoke in support of the amendment because he felt it would protect those many alcoholics and drug addicts who hold jobs and perform them satisfactorily. "Sections 503 and 504 of the Rehabilitation Act protect such persons employed by agencies which receive Federal funds or employers which have Federal contracts from being fired solely because of their alcoholism or drug addiction." *Id.* at 30324.

Another amendment proposed during debate would have amended § 505(a)(1) to limit a court in an action brought against the federal government to equitable and affirmative action remedies proportionate to actual damages.[4] 124 Cong.Rec. 30576. Its sponsor, Senator McClure, described the amendment's function as insuring "that mammoth affirmative action remedies involving substantial construction could not be compelled in instances in which actual damages were comparatively small." *Id.*

Senator McClure's amendment was vehemently opposed by Senator Cranston, a sponsor of the 1978 act, on the basis that the federal government should be required to do no less than private employers. Senator Cranston argued:

> The amendment offered by the Senator from Idaho would create an unwise and unrealistic distinction with respect to employment between the obligations of the Federal Government and the obligations of Federal contractors and grantees. Ironically, the Senator's amendment would limit—with a financial test—the Federal Government's obligation of being an equal opportunity employer. Federal contractors and grantees would—appropriately—continue to be required to be equal opportunity employers.

*Id.* at 30577–30578.

Finally, we would note the remarks of Representative Jefford, a member of the Subcommittee on Select Education, which reported the House version of the act, commenting on the creation of the Architectual

---

4. A compromise was reached later in debate, which resulted in the following language being inserted in § 505(a)(1): "In fashioning an equitable or affirmative action remedy ... a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy." 29 U.S.C. § 794a(a)(1).

and Transportation Barriers Compliance Board in § 118 of the amendments:

[W]e gave this board new and expanded responsibilities *for this one aspect of 504.* It is our thought that by separating only the "physical" barriers ... from actual discrimination in *jobs,* education, housing, and health, we have taken a significant step forward.

*Id.* at 13901 (emphasis added).

None of the above-quoted references to employment discrimination brought forth any objections from the speakers' colleagues in the House and Senate. Indeed, they did not bring forth so much as a question or request for clarification.

Combining the legislative history looking for the intent of Congress is often a frustrating chore. Often the intent of Congress hinges on the remarks of one or two individuals. *See North Haven, supra* —— U.S. at ——, 102 S.Ct. at 1918. Here our task has not been so difficult. Clearly, the legislative history to the 1978 amendments demonstrates a widespread understanding on the part of Congress that § 504, even as amended, proscribed employment discrimination against the handicapped.

C

Post-enactment pronouncements provide confirmation of Congressional intent to cover employment discrimination in § 504. The Senate Committee on Labor and Human Resources, whose predecessors reported both the 1973 Rehabilitation Act and its 1978 amendments, stated unequivocally one year after *Trageser, supra* :

[*Trageser*] is not consistent with Congress' original and continuing intent that handicapped individuals be empowered to bring suit in Federal District Court for alleged employment discrimination in violation of [section 504], regardless of the designated use of the Federal funds received by the employer in question.

In 1980, responsibility for coordinating enforcement of § 504 by federal departments and agencies was transferred to the Attorney General. In his analysis of rules promulgated pursuant to this authority, the Attorney General took note of HEW's earlier regulations prohibiting employment discrimination, *Trageser* and *Carmi,* the legislative history of both the 1973 Act and the 1978 amendments, and concluded, "[T]he Department believes that the employment practices of recipients of Federal financial assistance are covered by section 504 regardless of the purpose of the assistance ..." Nondiscrimination Based on Handicap in Federally Assisted Programs—Implementation of Section 504 of the Rehabilitation Act of 1973 and Executive Order 11914, 45 Fed.Reg. 37620, 37628 (1980).

V

Under the holding of the district court, Conrail is prohibited from discriminating against handicapped passengers, but is free to discriminate against the handicapped in employment. Such an analysis of § 504, unless supported by the words of the relevant statutes or their legislative history, is absurd.

Thus far, the handicapped have not been extended the broad protections against discrimination extended women and members of other minority groups. Federal law protects the handicapped only if employed by the federal government, or federal contractors or grantees. To eliminate protection against discrimination in employment by federal grantees would eliminate a substantial portion of the small amount of protection afforded the handicapped. What is a commonsensicle approach to Title VI, thus, becomes a devastating blow within the context of the Rehabilitation Act. "In the context of § 504 of the Rehabilitation Act, applied *Trageser*-style, § 604 operates as a blunder buss." *Scanlon, supra* at 1277 (Ferguson, J., dissenting). *See also, Carmi, supra* at 679 (McMillian, J., concurring). Neither the words of the statutes, nor legislative histories, dictate such a result.

For this reason, the order of the district court is reversed, and the case remanded for further consideration and ultimate disposition on the merits.

ADAMS, Circuit Judge, concurring in the judgment.

Had this appeal been presented for resolution several months ago, I might well

have joined the other four courts of appeals in concluding that the Act was not intended to cover discrimination against the handicapped by private employers. After all, the statute makes no direct reference to private employment, and it certainly is not unreasonable to read the restrictions contained in section 604 of Title VI into the Rehabilitation Act.

Nonetheless, I have concluded that the result reached by the Court in this case is consonant with, and perhaps even compelled by, two recent decisions, one by the Supreme Court, *North Haven Bd. of Educ. v. Bell,* —— U.S. ——, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), and the second by this Court, *Grove City College v. Bell,* 687 F.2d 684 (3d Cir. 1982). And whatever I might think of the wisdom of these two decisions, I am bound to apply them unless they are overruled.

In *North Haven,*[1] *supra,* the Supreme Court concluded that the Department of Education had statutory authority to regulate employment discrimination in education—even though Title IX of the Education Act makes no direct reference to employment, and even though Title IX, which was patterned after Title VI, might be thought to incorporate the employment-regulation restrictions of section 604 of Title VI. Nevertheless, the Justices reasoned that the broad-sweeping language of Title IX, which did not explicitly rule out the regulation of employment discrimination, when coupled with a strong legislative and postenactment history, constituted a sufficient basis from which to infer a congressional intent to bring employees within the protection of Title IX. The *North Haven* analysis, when applied to the words of the Rehabilitation Act—which for all relevant purposes are identical to the words of Title IX—and when considered in connection within the strong legislative history of section 504, would appear to compel a similar

conclusion. The theory and analysis underlying *North Haven,* then, would suggest that LeStrange prevail on this appeal.

In addition to *North Haven,* I am persuaded that it would be difficult to arrive at a contrary result in this matter after the recent opinion in *Grove City, supra.* In *Grove City,* also decided under Title IX of the Education Act, a panel of this Court concluded that an entire educational institution is brought within the definition of "program," and therefore subject to regulation under Title IX, if it receives any federal aid, and that aid is general or indirect and not specifically earmarked for a particular educational function within the institution. The logic of *Grove City* would appear to be irreconcilable with the analysis employed in *Trageser v. Libbie Rehabilitation Center, Inc.,* 590 F.2d 87 (4th Cir. 1978), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979), where an employer was deemed to fall within the purview of the Rehabilitation Act only if federal funds were received specifically for employment purposes.

For these reasons I join the judgment of the Court in returning this matter to the district court for further proceedings.

WEIS, Circuit Judge, concurring.

I join in the judgment of the court because I believe the case on which the district court relied, *Trageser v. Libbie Rehabilitation Center, Inc.,* 590 F.2d 87 (4th Cir. 1978), *cert. denied,* 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979), was erroneously decided. I agree that the issue in this case is not one of standing, as that term is ordinarily used, *see, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982), but is the more direct question of the scope of § 504.

*Trageser* held that the prohibition against handicap discrimination in § 504 of the Rehabilitation Act is limited by the reference

---

1. *North Haven* involved claims of gender discrimination committed by two public school districts in Connecticut. The Supreme Court noted that one of those districts, North Haven,

"devoted between 46.8% and 66.9% of its federal assistance to the salaries of its employees." —— U.S. at ——, 102 S.Ct. at 1916.

in § 505(a)(2) to the provisions of Title VI of the Civil Rights Act of 1964. That is, a claim of employment discrimination against the handicapped is subject to § 604 of Title VI: "Nothing contained in this subchapter shall be construed to authorize action ... by any department or agency with respect to any employment practice of any employer ... except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d–3.

Although it recognized that "§ 604 expressly curtails the authority of federal departments and agencies," the *Trageser* court concluded that "it also restricts private suits." 590 F.2d at 89. The court cited no authority for its conclusion and I am persuaded that it erred in applying § 604 to private suits. The language of § 604 confines its application to "action ... by any department or agency" and does not refer at any point to suits brought by a private individual or entity.

The Rehabilitation Act's reference to Title VI was not intended to restrict the remedies of handicapped individuals but rather to limit the sanctions which government agencies could take against an offending recipient of federal financial assistance. Congress enacted § 604 because it feared that when an employment violation occurred, an overzealous federal agency might threaten the very existence of important programs by invoking the remedy of withholding funds.[1] The reference to Title VI in § 505(a)(2) of the Rehabilitation Act must therefore be interpreted with the understanding that § 604 was drafted to prevent administrative overkill. Viewed in this light, it is clear that the incorporation of § 604 narrows not the rights of victims, but only the coercive measures which a "department or agency" can apply against an offender.

The dissenting opinion of Judge Ferguson in *Scanlon v. Atascadero State Hospital*, 677 F.2d 1271 (9th Cir. 1982), analyzes the errors of the *Trageser* opinion at length. I agree with Judge Ferguson and see no need to repeat here the reasoning which underlies the conclusions we both reach. *See also, Carmi v. Metropolitan St. Louis Sewer District*, 620 F.2d 672, 676 (8th Cir.), *cert. denied*, 449 U.S. 892, 101 S.Ct. 249, 66 L.Ed.2d 117 (1980), McMillian, J. (conc.).

It is worth noting that in *NAACP v. Wilmington Medical Center, Inc.*, 599 F.2d 1247, 1258 (3d Cir. 1979), this court concluded that there is a private right of action under § 504. Our holding today is wholly consistent with that case.

Of course, I intimate no views on the merits of this case and concur in the remand to the district court.

---

1. During congressional debates, Title VI was commonly referred to as the "cut-off-the-funds title." *See* Comment, *Employment Discrimina-* *tion Against the Handicapped: Can* Trageser *Repeal the Private Right of Action*, 54 N.Y.U.L. Rev. 1173, 1186 n.69.