**Rebecca NORCROSS, Plaintiff,**

v.

**Wallace SNEED, et al., Defendants.**

**Civ. No. 82–3054.**

United States District Court,
W.D. Arkansas,
Harrison Division.

Oct. 21, 1983.

Carol Hewett and Jonathan Hewett, Hewett & Hewett, Eureka Springs, Ark., for plaintiff.

Michael E. Kelly, Smith & Kelly, Yellville, Ark., for defendants.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

### I. *Introduction*

Plaintiff, Rebecca Norcross, brought this action pursuant to 28 U.S.C. § 1343, 29 U.S.C. § 794 (the Rehabilitation Act of 1973), and 28 U.S.C. § 1331 against defendants, Wallace Sneed, Terry Wood, Kelly Hurst, Jimmie French, Mickey Wood, Billie Self, Burness Stoner and Jerry Franks.

Defendant, Wallace Sneed, is the former Superintendent of the Flippin School District, serving as such at the time plaintiff's claim allegedly arose. Defendants, Terry Wood, Kelly Hurst, Jimmie French, Mickey Wood and Billie Self, were members of the Flippin School Board at the time the claim allegedly arose. These defendants are joined as defendants in both their individual and representative capacity.

Defendants, Burness Stoner and Jerry Franks, are joined as defendants in their official capacities only, being necessary

parties to the injunctive relief sought. Defendant Jerry Franks is the current Superintendent of the Flippin School District. Defendant Burness Stoner replaced defendant Kelly Hurst on the Flippin School Board.

The Flippin School Board is also named as a defendant.

Plaintiff contends that she was denied employment as a school librarian because of her being "legally blind" and seeks injunctive relief in the form of instatement, back pay and retroactive benefits. Plaintiff also seeks compensatory damages for mental distress, punitive damages and attorney's fees.

### Factual Summary

■ Plaintiff was born with a congenital visual impairment which renders her legally blind. Plaintiff's vision in her right eye can be corrected to 20/200 visual acuity. The vision in plaintiff's left eye is unmeasurable, and what little vision there is in this eye is of a nature which causes double vision and distortion of the corrected vision in the right eye. Plaintiff has no night vision at all.

Although no expert testimony was presented as to plaintiff's visual handicap, plaintiff and Aaron Hawkins, who is totally blind, testified that "legally blind" is described as vision that measures no greater than 20/200 with corrective lenses. Plaintiff has been certified "legally blind" by her ophthamologist and by the federal government for purposes of receiving federal benefits accorded to blind persons. In any event, defendants do not assert that plaintiff is not "legally blind," and, considering the evidence adduced, the Court specifically finds that plaintiff is "legally blind" and is a "handicapped individual" within the meaning of 29 U.S.C. § 706(7)(B). *See Gurmankin v. Costanzo*, 411 F.Supp. 982 (E.D.Pa.1976), *aff'd*, 556 F.2d 184 (3rd Cir.1977).

Plaintiff is capable of reading some print, however, and received a B.S. degree in library science from Sam Houston State University, Huntsville, Texas, in January, 1966, notwithstanding her disability.

After her graduation, she was employed for three years as assistant librarian at F.M. Black Junior High School in Houston, Texas. Because of pregnancy and family commitments, she quit her employment at F.M. Black Junior High School in January, 1969.

From 1969 to 1978, plaintiff remained outside of the work force. She again sought employment in June, 1978, at which time she inquired as to employment opportunities at the Flippin school system. At the time plaintiff made this initial inquiry, she resided in Houston, Texas. Plaintiff met with defendant, Wallace Sneed, in early June of 1978, the meeting having been arranged by defendant, Jimmie French.

At the meeting plaintiff described her education and experience in the field of library science, and advised defendant, Wallace Sneed, that she was legally blind. Mr. Sneed asked plaintiff to read aloud from a letter from his desk and plaintiff did so.

At the time of this initial meeting, there were no positions available with the Flippin system, plaintiff was a citizen and resident of Texas, and plaintiff was not certified in the state of Arkansas.

Defendant Sneed told plaintiff she could fill out an application form and further advised her that she would need to obtain certification in Arkansas. Plaintiff filled out the application provided.

Plaintiff and her family moved to Flippin, Arkansas, from Houston, Texas, at the start of the school year in the fall of 1978. Plaintiff testified that shortly after moving to Flippin she was contacted by Mr. Bryant, the elementary school principal, who asked her if she was interested in a teacher's aide position. Although the position as teacher's aide required only a high school diploma, plaintiff indicated that she was interested. Plaintiff was not contacted further and assumed that another person was hired. Mr. Bryant had no independent recollection of contacting plaintiff in

1978, but stated that it was possible that he had simply forgotten the occasion.

In January, 1979, plaintiff was certified by the Arkansas Department of Education as Librarian, K–12 (Kindergarten through Grade 12), and soon thereafter again contacted defendant Sneed by telephone, informing Mr. Sneed of her certification and her further interest in a position as librarian if one became available. Plaintiff testified that Mr. Sneed replied that if such a position became available, he would hire the most qualified applicant.

In July, 1979, plaintiff submitted another application to defendant Sneed requesting consideration for any available position. On this application plaintiff included a local reference to her supervisor at the Ranger Boat Company in Flippin, where she had worked for a brief period in the upholstery department.

Approximately one month later, Mr. Bryant called plaintiff and asked her if she could be available for work the next day and thereafter as a teacher's aide. Mr. Bryant needed a replacement for an aide because of a last minute cancellation. Although plaintiff's visual handicap was mentioned, plaintiff assured Mr. Bryant that her handicap would not be a problem and Mr. Bryant decided to employ plaintiff as an aide. Plaintiff completed a school year of employment as an aide.

During this school year plaintiff worked as a kindergarten aide and instructed small groups under supervision. She received no criticism of her performance, although there was a controversy concerning her responsibility for playground duties. Plaintiff's supervisor, Meg Hanna, counseled her as to methods of better instructing the students.

The controversy arose from resentment from other teachers of plaintiff's failure to perform playground duties during her first semester as an aide. After Mr. Bryant informed plaintiff of her responsibility for playground duty, she performed these duties. Mr. Bryant and other teachers admitted that they were concerned with the children's safety because of plaintiff's visual impairment.

Plaintiff had some difficulty as an aide, bumping into the cots of kindergarten pupils during naptime due to the dim lighting during such periods.

The "counseling" Meg Hanna provided was directed toward plaintiff's difficulty in instructing pupils at the periphery of a group.

During this first year, Mr. Bryant received some reports that plaintiff was cross and irritable on occasion with the children. At the time she was experiencing medical and personal problems and the parties seem to concede that plaintiff's attitude problem was caused by her medical and personal problems and that such complaints stopped when plaintiff's medical concerns were alleviated. Defendant Sneed was advised of these considerations by Mr. Bryant.

Plaintiff was not re-employed as a teacher's aide for the following year because of a cutback in federal funding.

Near the end of the 1979–80 school year, plaintiff learned that the high school librarian, Geneva Hurst, had decided not to return in the 1980–81 year. She called Mr. Sneed's office in May, 1980, to confirm that her applications were still on file.

On June 2, 1980, plaintiff visited Mr. Sneed at his office to reiterate her interest in the library position. At that meeting Mr. Sneed told plaintiff that he would not recommend her for the job as librarian. Plaintiff contends that Mr. Sneed also said that he would refuse to recommend her because of her visual handicap. Mr. Sneed testified that he told plaintiff that he would not recommend her to the board because of problems she encountered as a teacher's aide: crossness, supervision, discipline and problems with playground duty.

Plaintiff testified that Mr. Sneed further told her that he would not submit her application for consideration. Defendant Sneed denied having made any such statement.

Following the June 2, 1980, meeting, plaintiff contacted the board members to

report Mr. Sneed's alleged refusal to submit plaintiff's application. She outlined her qualifications to each board member and advised them that she was legally blind. Defendant, Billie Self, told plaintiff that he would ensure that her application would be considered. Defendant, Terry Wood, after talking to plaintiff, contacted Mr. Sneed advising Mr. Sneed to submit plaintiff's application to the board. Neither defendant Sneed nor defendant Wood remember any details of this conversation.

On June 4, 1980, defendant Sneed contacted plaintiff requesting a new application because her other application had been temporarily misplaced. Plaintiff completed and delivered an application with letters of reference on June 13, 1980.

By letter dated June 12, 1980, received June 13, 1980, defendant Sneed "reminded" plaintiff to submit her application.

After Mr. Sneed learned of Mrs. Hurst's intention not to return as librarian in the 1980–81 school year, Mr. Sneed was advised by the Superintendent of Schools in Eureka Springs, at a superintendents' meeting, that Mrs. Frolkey, a fourth grade teacher at the Flippin schools, had been an excellent librarian while employed at the Eureka Springs schools.

Mr. Sneed called Mrs. Frolkey advising her of Mrs. Hurst's resignation and requested that she submit an application for the position if she was interested. On June 7, 1980, Mrs. Frolkey's application was received.

Mrs. Frolkey was well known to everyone in the Flippin school community. She possessed a double Arkansas certificate as Librarian/K–12 (Kindergarten through Twelfth Grade/Elementary.)

Mrs. Frolkey had taught fourth grade at Flippin since 1977. Although her application reflected only one year as a librarian at the Eureka Springs high school because of space limitations on the application, she had a total of six years' experience employed as a school librarian in two Iowa schools similar in size to Flippin prior to her position in Eureka Springs.

Mr. Sneed testified that he was aware of Mrs. Frolkey's prior experience, as were most persons in the Flippin educational community. Mrs. Frolkey testified that she advised Mr. Sneed of her library experience during her initial interview when she first applied for the fourth grade position.

In the 1980–81 school year the number of students passing from third to fourth grade mandated a cutback of one fourth grade teacher. This, in all likelihood, explains Mr. Sneed's contacting Mrs. Frolkey, and Mrs. Frolkey's interest in the librarian position which she did not regard as a "promotion."

A board meeting was held on June 23, 1980. At the meeting were the board members, Mr. Sneed, plaintiff and her husband, Rev. Sam Williams and his wife, and a newspaper reporter, Linda Leicht.

After the board decided to convene an executive session, plaintiff expressed her desire to make a presentation concerning her application. Plaintiff did so for five to ten minutes, at which time the board convened in executive session.

For approximately two hours the board deliberated. When the public was re-admitted, the board announced that it had unanimously selected Mrs. Frolkey for the librarian position.

These board members and Mr. Sneed admitted that the decision was a choice between plaintiff and Mrs. Frolkey because the other applicants for the position were not even minimally qualified.

During the executive session plaintiff's visual handicap was discussed, although no one remembers the exact context. The Court believes that any such reference was made in the context of seeking factual information as to the extent of plaintiff's handicap with reference to whether plaintiff could perform the duties.

All of the board members testified that Mrs. Frolkey was chosen because they felt she was the most qualified. They noted that plaintiff had served ten years earlier as an "assistant librarian," while on the face of the application Mrs. Frolkey had

served within the past six years as a "librarian" in a similar sized school. Plaintiff's total teaching experience comprised three years as an assistant librarian at F.M. Black Junior High School in Houston, Texas, and one year as a teacher's aide in Flippin, while Mrs. Frolkey had 22 years' teaching experience, five years as head librarian in a high school similar to Flippin, and had taught three years in the Flippin school district with a double certification.

The board members regarded both Mrs. Frolkey and plaintiff as qualified and indicated that plaintiff would have been chosen had Mrs. Frolkey not been.

After the June 23, 1980, meeting, plaintiff retained attorney Stephen Crain to represent her in reference to what plaintiff believed to be discrimination against her by the board and Mr. Sneed.

At the July 28, 1980, board meeting, Mr. Crain told the board that they had violated Arkansas' Freedom of Information Act, ARK.STAT.ANN. § 12–2801 *et seq.* Mr. Crain engaged in a long dissertation concerning the rights of the handicapped. Following Mr. Crain's presentation, the board voted publicly and unanimously to hire Mrs. Frolkey.

Subsequently, plaintiff filed an administrative grievance with the Office of Civil Rights. As a result, the school was required to formulate a job description for the librarian position. Mr. Sneed and Mrs. Frolkey jointly promulgated such a job description.

The job description requires playground and hall duties as requested and requires that the librarian be able to drive on the annual special field trip to Little Rock; however, Mrs. Frolkey and Geneva Hurst both testified that they have never been required to do playground or hall supervision as a full-time librarian. Geneva Hurst further testified that the Flippin schools hired a van and chauffeur for the field trip during her last year there.

As a result of the foregoing events, plaintiff instituted this action, contending that the actions of Mr. Sneed and the board had violated her rights to due process and equal protection and denied her rights secured by 29 U.S.C. § 794 (§ 504 of the Rehabilitation Act of 1973).

## II. *Applicable Law*

Section 504 of the Rehabilitation Act of 1973 provides in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in [29 U.S.C. § 706(7)], shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794 (as amended by section 119 of the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub.L. No. 95–602, 92 Stat. 2955, 2982) (hereinafter "1978 amendments").

Although the Supreme Court expressly declined to consider whether a private cause of action may be implied under section 504, *Southeastern Community College v. Davis,* 442 U.S. 397, 404 n. 5, 99 S.Ct. 2361, 2366 n. 5, 60 L.Ed.2d 980 (1979), the federal courts that have considered the issue have uniformly ruled that a private right of action is so available. *Miener v. Missouri,* 673 F.2d 969 (8th Cir.1982).

Section 504 provides coverage for any "otherwise qualified handicapped individual." "Handicapped individual" is defined as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(7)(B) (as amended by the 1978 amendments).

"Life activities" include "communication, ambulation, self care, socialization, education, vocational training, employment, transportation, adapting to housing, etc." 41 C.F.R. § 60–741.53, appendix A (1981).

"Substantially limits" means the degree that the impairment affects employability. A handicapped individual who is likely to experience difficulty in securing, retaining or advancing in employment would be considered "substantially limited." *Id.*

It is conceded that plaintiff meets these two criteria, and thus is a "handicapped individual" within the meaning of section 504. Thus, our initial inquiry is whether plaintiff is an "otherwise qualified" handicapped individual.

In *Davis, supra,* the Supreme Court held that an "otherwise qualified" individual is "one who is able to meet all of a program's requirements in spite of his handicap." In *Davis,* the Court held that the plaintiff was not entitled to relief because her handicap, *i.e.,* deafness, would prevent her from performing the duties imposed by the nursing program which had refused to admit her.

In *Simon v. St. Louis County,* 656 F.2d 316 (8th Cir.1981), the Court of Appeals for the Eighth Circuit held that *Davis* does not require a plaintiff to satisfy all of the stated physical requirements of the job in order to be "otherwise qualified," but directed that only those which are "reasonable, necessary and legitimate requirements and which could not feasibly be changed in order to accommodate the plaintiff may be considered in making the "otherwise qualified" determination. However, *Davis* explicitly provides that any regulation or interpretation of section 504 which purports to require "substantial adjustments" in existing programs beyond those necessary to "eliminate discrimination against otherwise qualified individuals" would constitute an unauthorized extension of section 504. *See Davis, supra,* 442 U.S. at 410, 99 S.Ct. at 2369.

In addition to the requirements that a section 504 plaintiff must be "handicapped" and "otherwise qualified" to fall within the purview of the Act, the courts are divided on the issue of whether a further requirement must be imposed on those bringing employment discrimination section 504 claims.

The majority of circuits have in the past held that a handicapped plaintiff alleging discrimination in employment must further demonstrate that he or she is intended to be one of the "primary beneficiaries" of the federal assistance received by the defendant employer. Under this view, the plaintiff must show that the "primary purpose" of the federal assistance to the defendant is to provide employment. *Carmi v. Metropolitan St. Louis Sewer Dist.,* 620 F.2d 672 (8th Cir.1980); *Trageser v. Libbie Rehabilitation Center,* 590 F.2d 87 (4th Cir.1978); *Scanlon v. Atascadero State Hospital,* 677 F.2d 1271 (9th Cir.1982); *United States v. Cabrini Medical Center,* 639 F.2d 908 (2nd Cir.1981). This requirement is derived by analogy from section 604 of the Civil Rights Act, 42 U.S.C. § 2000d–3.

Section 505(a) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), provides:

(2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance.

Section 604 of the Civil Rights Act of 1964 provides:

Nothing in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organizations *except where a primary objective of the Federal financial assistance is to provide employment.* (emphasis added.)

The courts that require that the primary objective of the Federal assistance be to provide employment have utilized a variety of rationale to justify the incorporation of section 604 into the Rehabilitation Act. In *Carmi,* the Court of Appeals for the Eighth Circuit essentially concluded that Congress intended Title VI and the Rehabilitation Act to be read *in pari materia.* The Court of Appeals for the Fourth Circuit, in *Trageser,* determined that Congress intended to incorporate section 604 into the

Rehabilitation Act when it was amended to include section 505. The Court of Appeals for the Ninth Circuit adopted the *Trageser* analysis, over a strong dissent, in *Scanlon.*

Other courts have taken a less restrictive view, holding that plaintiff had to establish only that the program or activity from which the plaintiff was excluded was "directly benefited" by federal assistance. *Brown v. Sibley,* 650 F.2d 760 (5th Cir. 1981); *Simpson v. Reynolds Metals Co.,* 629 F.2d 1226 (7th Cir.1980); *Jones v. Metropolitan Atlanta Rapid Transit Authority,* 681 F.2d 1376 (11th Cir.1982); *Le Strange v. Consolidated Rail Corp.,* 687 F.2d 767 (3rd Cir.1982).

The Court of Appeals for the Eleventh Circuit, in *Jones,* reasoned that section 505 of the Rehabilitation Act provides that the "remedies, procedures, and rights" of an aggrieved party are found in Title VI of the Civil Rights Act of 1964, but does not state that suits under section 504 are *controlled* by Title VI. Thus, the Court of Appeals for the Eleventh Circuit concluded that section 604 of the Civil Rights Act, as a substantive restriction on standing, does not constitute a "right, remedy, or procedure" within the meaning of section 505. The Court of Appeals for the Fifth Circuit reached the same conclusion in *Brown,* based upon the language of section 504, its legislative history, and by analogy to Title VI and Title IX.

The Court of Appeals for the Third Circuit, in *Le Strange,* also reached the same conclusion, premising its position on the Supreme Court's decision in *North Haven Board of Education v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). In *North Haven,* a similar question under Title IX of the Education Amendments of 1972 was evaluated and the Supreme Court found no requirement that federal assistance be primarily for the purpose of providing employment.

Reasoning by analogy, the Court of Appeals for the Third Circuit, in *Le Strange,* noted that section 901(a) of Title IX, of the Education Amendments of 1972, like section 504 of the Rehabilitation Act, is mod-

eled after section 601 of Title VI of the Civil Rights Act of 1964.

Section 901(a) provides:

No person ... shall, on the basis of sex, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

The Court of Appeals for the Third Circuit said:

The statutory language of section 504 of the Rehabilitation Act and section 901 of Title IX being virtually identical, we are bound to conclude, like the Supreme Court in *North Haven,* that because section 504 "neither expressly nor impliedly excludes employees from its reach, we should interpret the provision covering and protecting these 'persons' unless other considerations counsel to the contrary."

*Le Strange* at 769–70.

After exhaustive review of the legislative history of section 504 of the Rehabilitation Act of 1973 and the 1978 amendments, *see Le Strange* at pp. 772–76, the Court of Appeals for the Third Circuit found no "considerations" which "counsel to the contrary."

At the time *Carmi* was decided, the only Circuit Court decision on point was the Fourth Circuit's opinion in *Trageser.* The district court in *Carmi,* 471 F.Supp. 119 (E.D.Mo.1979), found that Carmi was not an "otherwise qualified handicapped individual" who suffered discrimination "solely by reason of his handicap," and rendered judgment for defendant. On appeal to the Court of Appeals for the Eighth Circuit, the court, rather than determining whether this finding was "clearly erroneous" and affirming on that basis, undertook discussion of "the difficult issue of whether sections 504 and 505 of the Rehabilitation Act ... cover employment practices of recipients of federal grants," notwithstanding that the appellant could not prevail "even if the Act is applicable to discrimination in employment by recipients of federal

grants." *Carmi, supra,* at 676–77 (McMillian, J., concurring). Thus, irrespective of how the panel in *Carmi* ruled on this issue, the outcome would nonetheless have been in favor of defendant/appellee. Judge McMillian concurring in the result would have held "that the Rehabilitation Act imposes a requirement that entities receiving federal grants refrain from discriminating against their employees on the basis of handicap." *Carmi,* at 680 (McMillian, J., concurring).

> Part of the rationale in *Carmi* was that § 794 (§ 504 of the Act) was also modeled after § 901 of Title IX, 20 U.S.C. § 1681. Our interpretation here is consistent with recent decisions in which the language of § 901(a) of Title IX, which is virtually identical to that of § 794, has been construed as covering only direct beneficiaries of federal funds.

*Carmi, supra,* at 675 n. 6.

The obvious response to this is that under *North Haven,* section 901(a) of Title IX was held to contain *no* requirement that the federal assistance be primarily for the purpose of providing employment. "Title IX proscribes employment discrimination in federally funded education programs." *North Haven,* 102 S.Ct. at 1926. Thus, the continued vitality of *Carmi* is suspect, as the Court of Appeals for the Eighth Circuit expressly declared that section 504 "is modeled after" Title IX, and the Supreme Court explicitly found no requirement in Title IX that the federal assistance be primarily for the purpose of benefiting a plaintiff.

In order for *Carmi* to have any continued validity, the Court of Appeals for the Eighth Circuit would have to declare that a Title IX analysis is separate and distinct from a section 504 analysis, a position difficult to maintain in the face of its own language:

> § 794 (§ 504 of the Act) was modeled after § 901 of Title IX.... [T]he language of § 901(a) of Title IX ... is virtually identical to that of § 794....

*Carmi, supra,* at 675 n. 6.

Since the date on which *Carmi* was decided by a split panel, not only did *North*

*Haven* change the law upon which the holding in *Carmi* was partially based, but *Carmi* and *Trageser* have been soundly criticized by the unanimous Eleventh Circuit panel in *Jones,* 681 F.2d at 1382 n. 14, the unanimous Third Circuit panel in *Le Strange* and Judge Ferguson dissenting in the Ninth Circuit split-panel decision in *Scanlon* (citing Judge McMillian's concurrence in *Carmi* ). After all of the above cases were reported, the Court of Appeals for the Fifth Circuit reaffirmed its holding that a plaintiff in a section 504 case need only show that the program with which the plaintiff is involved either received or directly benefited from federal assistance. *Doe v. Region 13 Mental Health-Mental Retardation Com'n,* 704 F.2d 1402 (5th Cir.1983).

■ Thus, in light of intervening Supreme Court and Circuit Court decisions since *Carmi* was decided, the reasoning of which the Court finds compelling, the Court believes, in accordance with the clear trend of modern precedent, that *Carmi* is no longer good law and that the Court of Appeals for the Eighth Circuit would adopt the law and reasoning expressed by the Court of Appeals for the Third Circuit in *Le Strange* and the Eleventh Circuit in *Jones.*

Accordingly, we conclude that in private suits under sections 504 and 505 of the Rehabilitation Act of 1973 as amended by the 1978 amendments, a plaintiff need only show that the program with which the plaintiff is involved either received or directly benefited from federal assistance, and not that the primary purpose of the financial assistance was to provide employment.

■ Assuming that these initial prerequisites are met, a plaintiff may then go forward with his proof of discrimination. In *New York State Assn. for Retarded Children v. Carey,* 612 F.2d 644 (2nd Cir. 1979), the Court of Appeals for the Second Circuit ruled that the *prima facie* case doctrine established in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973), applies to section 504 suits.

The Court of Appeals for the Fifth Circuit elaborated on the precise nature of the burdens in a section 504 suit in *Prewitt v. United States Postal Service*, 662 F.2d 292 (5th Cir.1981). The Fifth Circuit said in this regard:

(1) [T]he disabled claimant may establish a prima facie case of unlawful discrimination by proving that: (a) except for his physical handicap, he is qualified for the position; (b) he has a handicap that prevents him from meeting the physical criteria for employment; and (c) the challenged physical standards have a disproportionate impact on persons having the same handicap he suffers. To sustain this prima facie case, there should also be a facial showing or at least plausible reasons to believe that the handicap can be accommodated or that the physical criteria are not "job related."

(2) Once the prima facie case of handicap discrimination is established, the burden of persuasion shifts to the ... employer to show that the physical criteria offered as justification for refusal to hire the plaintiff are "job related," *i.e.*, that persons who suffer from the handicap plaintiff suffers and who are, therefore, unable to meet the challenged standards, cannot safely and efficiently perform the essentials of the position in question....

(3) If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection criteria without a similar discriminatory effect would also serve the employer's legitimate interest in efficient and trustworthy workmanship.

Other circuits have concluded that the issues of discriminatory intent, disparate treatment or disparate impact analysis are not pertinent to a section 504 case. *Pushkin v. Regents of University of Colorado*, 658 F.2d 1372 (10th Cir.1981); *Doe v. New York University*, 666 F.2d 761 (2nd Cir. 1981). These courts reason that section 504 sets out its own criteria:

First, the individual is required to show that he is otherwise qualified for the position sought; second, the individual must show that even though he is otherwise qualified, he was rejected for the position solely on the basis of his handicap. The two factors are interrelated, since if the individual is not otherwise qualified, he cannot be said to have been rejected solely because of his handicap.

A case-by-case application of the appropriate burden of proof is required due to the varying factual situations presented in each individual case.

■ The Court believes that the burden of proof in the instant case should be as follows: First, plaintiff must show that she is an "otherwise qualified handicapped" individual, that she applied for the position as librarian, and that she was rejected. If plaintiff satisfies this requirement, defendant must articulate legitimate, non-discriminatory reasons for rejecting the plaintiff's application for the position. Having satisfied this requirement, the burden shifts to the plaintiff to show that the reasons offered are pretextual and that plaintiff was rejected solely because of her handicap. Plaintiff retains the ultimate burden of persuasion on the case as a whole to prove that she is an "otherwise qualified handicapped individual" and that she was rejected solely because of her handicap.

### III. *Discussion*

■ The Court concludes that plaintiff is an "otherwise qualified handicapped individual." Although plaintiff may have some difficulty in performing hall duty and playground duty due to her limited vision, both Mrs. Hurst and Mrs. Frolkey testified that full-time librarians had never been required to perform these duties. The job description required by the Office of Civil Rights requires only that the librarian perform these duties "as requested."

Similarly, although the librarian is responsible for the annual Little Rock field trip, the stated job requirement of driving ability for this purpose is not a "reasonable, necessary and legitimate" requirement,

and could feasibly be changed to accommodate the plaintiff. Plaintiff could obtain alternate transportation for the students as Mrs. Hurst did in her last year.

As the school board members uniformly testified that plaintiff would have been hired had Mrs. Frolkey not been hired instead, defendants implicitly concede that plaintiff was at least minimally qualified for the library position. Further, plaintiff's experience in this area further demonstrates that she was at least minimally qualified for such a position.

█ Thus, the burden shifts to the defendants to articulate genuine non-discriminatory reasons for the failure to hire her.

We believe that defendants have met this burden. Plaintiff had not been personally involved in any school system since 1969 while Mrs. Frolkey was currently teaching at Flippin. Although Mrs. Frolkey had not served as a librarian in six years, plaintiff had not done so in ten years. Mrs. Frolkey was regarded as an excellent teacher and librarian while plaintiff was virtually unknown and suffered various problems in her role as a teacher's aide. Mrs. Frolkey was double-certified and had more experience both as a librarian and as a teacher than did the plaintiff. Mrs. Frolkey had lived in the area longer than had the plaintiff and had past work experience in the area and in schools of the same general size as Flippin's. Mrs. Frolkey had served as a head librarian while plaintiff's only experience in the library field was as an assistant librarian, although it is true that the duties were similar.

Simply stated, the Court believes that there is ample evidence in the record of legitimate, non-discriminatory reasons for the board's action in hiring Mrs. Frolkey. Thus, plaintiff must come forward with evidence that these reasons are mere "pretext" and that plaintiff was denied employment solely because of her handicap.

Defendants do not contend that plaintiff is not qualified for the position and admitted that plaintiff would have been hired had Mrs. Frolkey not been.

As evidence of pretext, plaintiff argues that Mr. Sneed's requiring plaintiff to submit to two "employment tests" which were not required of the other candidates shows that it was bias against her rather than Mrs. Frolkey's qualifications which was dispositive. See 45 C.F.R. § 84.13(B) (appendix A). These two "tests" were allegedly comprised of Mr. Sneed's asking plaintiff to read and plaintiff's employment as an aide.

However, Mr. Sneed did not ask plaintiff to read until plaintiff advised him of her blindness. Although the regulations prohibit tests that simply measure the degree of impairment, this rule is inapplicable where the test measures job-related skills. The ability to read is a legitimate job-related skill, as plaintiff concedes. Thus, although the situation could probably have been handled more tactfully, the Court does not believe that the incident can reasonably lead to an inference that plaintiff was not hired solely because of her handicap.

Plaintiff asserts that she was employed as an aide solely to "test" her ability to function in an academic environment, and that her performance as an aide is wholly unrelated to plaintiff's skills as a librarian.

The Court does not agree that the two jobs are so completely different as to render plaintiff's performance in one wholly irrelevant to ability in the other. Acceptability in the areas of supervision, discipline and temperament would appear to be a prerequisite for any teaching assignment just as dependability is a legitimate concern of any employer for any position.

Further, plaintiff admits that the aide position was given to her because the school was desperate for a last-minute replacement. The fact that the school employed plaintiff as an aide because they were "desperate" lends no inference toward the existence of a discriminatory animus. The school's reluctance to employ an educationally over-qualified individual unless there were no alternative is not evidence of discriminatory motive.

■ Plaintiff correctly notes that the burden of proving that an employer's reasons are a pretext for discrimination is essentially a burden of persuasion. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Although there was evidence in the record to the effect that Mr. Sneed acted somewhat less than tactfully toward plaintiff, and perhaps that Mr. Sneed was not particularly fond of plaintiff, the Court believes that Mr. Sneed's attitude toward plaintiff was purely personal and did not result in plaintiff's rejection solely because of her handicap.

Although the board could hardly have been unaware of plaintiff's perception of Mr. Sneed's attitude, it was plaintiff who repeatedly brought this knowledge to the attention of the board, however proper her motives.

It is true that Mr. Sneed refused to endorse plaintiff for the position, but Mr. Sneed refused to endorse Mrs. Frolkey as well. Thus, all persons concerned were aware that Mr. Sneed's official position was neutral, whatever his personal feelings may have been. Since the board normally relies to a great extent on the recommendations of the superintendent, Mr. Sneed's official neutrality forced the board to make its decision independently of Mr. Sneed's feelings in the matter. Thus, as it is the board's employment of Mrs. Frolkey rather than plaintiff that is the basis of the instant action, and because the board was able to articulate legitimate, non-discriminatory reasons for its actions, plaintiff must persuade the Court that the board shared Mr. Sneed's personal attitude toward plaintiff, that this attitude was a result of plaintiff's disability, and that the board completely ignored the relative qualifications of plaintiff and Mrs. Frolkey and refused to hire plaintiff solely because of her handicap. Plaintiff fails to meet this burden.

Defendant French was acquainted with plaintiff prior to plaintiff's having expressed an interest in the position. Mr. French arranged plaintiff's initial meeting with Mr. Sneed and interceded on her behalf, whether necessary or not, to insure that plaintiff's application would be given full and fair consideration. Nonetheless, Mr. French voted to hire Mrs. Frolkey.

Mr. Sneed testified that he had a son, now deceased, that had been born blind, and that, as a result, he was acutely aware of problems of the handicapped and had always endeavored to assist handicapped persons whenever possible.

Having carefully considered and scrutinized the testimony, conduct and demeanor of the witnesses, weighed the facts and all legitimate inferences that may be drawn therefrom, the Court concludes that plaintiff has failed to demonstrate that the reasons offered for not hiring plaintiff are pretextual and thus has failed to demonstrate that she was refused employment solely by reason of her handicap.

Plaintiff advances another theory of liability. Plaintiff argues that she has an independent cause of action for violations of section 504 pursuant to 42 U.S.C. § 1983.

■ While it is true that section 1983 is available for allegations of purely statutory violations, it is also true that section 1983 is *not* available where Congress has foreclosed private enforcement of section 1983 in the enactment itself or where the statute is not of the kind that creates "rights" under section 1983. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

In this regard, the Court notes that if section 504 actions are available against those entities "directly benefited" by Federal financial aid, rather than being limited to situations wherein the "primary purpose" of the financial aid is to provide employment, as the Court so holds, the remedial devices available under section 504 may be sufficiently comprehensive so as to demonstrate a congressional intent to preclude the remedy of suits under section 1983. *See Middlesex County Sewerage Authority v. Sea Clammers*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

■ However, because plaintiff did not prevail in her private action under section 504, it follows that section 1983 is not available to plaintiff to remedy a section 504 violation. Section 1983 cannot breathe new life into an unsuccessful section 504 claim. Thus, we need not decide whether, under appropriate facts, section 1983 provides a remedy for a violation of section 504.

Plaintiff also advances claims under the Fourteenth Amendment for alleged deprivations of equal protection and due process.

■ Proving deprivation of equal protection under the Fourteenth Amendment requires a showing that the decisionmaker selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects on an identifiable group or member of an identifiable group. *Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

■ Because the Court does not believe that plaintiff was denied employment because of her handicap and finds that the board had a rational basis for its actions, plaintiff's equal protection claim is unavailing.

■ As to plaintiff's due process claim, it is clear that plaintiff has no protected "property" interest.

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971), at 577, 92 S.Ct. at 2709.

Nor does plaintiff have a protected "liberty" interest.

It stretches the concept too far to suggest that a person is deprived of "liberty" when he simply is not rehired in one job but remains as free as before to seek another.

*Roth, supra,* at 575, 92 S.Ct. at 2708.

Plaintiff was not stigmatized in any manner by not being hired as a librarian by the Flippin schools.

■ With respect to the procedural aspect of due process, assuming without deciding that plaintiff was entitled to some sort of hearing, it is beyond question that plaintiff has had ample opportunity to present and argue her qualifications for the job, as well as to air her grievance. Plaintiff advised Mr. Sneed and each school board member individually of her qualifications, and plaintiff was represented by counsel at a subsequent school board meeting where her qualifications and grievance were heard by the full board. Thus, any hearing to which plaintiff was entitled was sufficiently provided. Therefore, the Court finds plaintiff's constitutional claims to be without merit.

Having concluded that plaintiff was not refused employment solely as a result of her handicap within the meaning of section 504, any discussion as to whether the Flippin school system was "directly benefited" by federal financial assistance, or whether the "primary purpose" of the federal aid was to provide employment, would be superfluous.

■ The Court desires to point out that it expresses no opinion as to whether plaintiff should or should not have been hired, or whether plaintiff or Mrs. Frolkey would be a better librarian. It is not the function of this Court to sit in review of the various personnel decisions made daily by school boards, government agencies, or private business. It is only when the minimal protections afforded by the Constitution and federal legislation enacted pursuant thereto are violated that this Court may act. The relative wisdom or fairness of employment decisions are not properly reviewable by this Court.

The Court specifically wishes to commend the plaintiff for her perseverance, tenacity, and accomplishments in life and

this Memorandum Opinion in no way is intended to reflect negatively upon plaintiff's abilities as a wife, mother, employee, or as an individual. However, in light of the foregoing findings of fact and conclusions of law, the Court has no alternative but to dismiss plaintiff's complaint and to enter judgment in favor of defendants.

Judgment in accordance with this Memorandum Opinion will be concurrently entered.